IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

JEFFREY DEMOND WILLIAMS,            §
                                    §
            Petitioner,             §
                                    §
v.                                  §    CIVIL NO. H-04-2945
                                    §
NATHANIEL QUARTERMAN,[1] Director,  §
Texas Department of Criminal        §
Justice-Correctional Institutions   §
Division,                           §
                                    §
            Respondent.             §

**MEMORANDUM AND RECOMMENDATION**

Petitioner Jeffrey Demond Williams ("Williams"), a Texas inmate convicted of capital murder and sentenced to death, seeks federal habeas relief under 28 U.S.C. § 2254 on the grounds that mental retardation exempts him from execution. The Texas state courts refused to set aside his death sentence. This court held an evidentiary hearing and has considered substantial record evidence relating to Williams' mental retardation claim. Having reviewed the state court record, the evidentiary hearing testimony and exhibits, and the relevant law, this court **RECOMMENDS** that the court **DENY** Williams' petition for a writ of habeas corpus and **DISMISS** this case with prejudice.

I. **Statement of the Case**

The facts of the crime are discussed in detail in the court's

---

[1]     On June 1, 2006, Nathaniel Quarterman replaced Douglas Dretke as the Director of Texas Department of Criminal Justice-Correctional Institutions Division. Accordingly, Quarterman "is automatically substituted as a party." Fed. R. Civ. P. 25(d)(1).

July 15, 2005, Memorandum and Order.  They are briefly summarized here.

On the night of May 18, 1999, Houston Police Officer Tony Blando was on duty looking for stolen vehicles.  Blando was in plainclothes and drove an unmarked car, but wore his badge around his neck.  In the parking lot of the Roadrunner Inn, Blando saw Williams driving a Lexus.  A computer search revealed that the car had been stolen in an aggravated robbery.  Blando approached Williams with his weapon drawn.  Blando attempted to handcuff Williams.  A witness saw the two men struggle.  Williams shot Blando and fled.  Blando died at the scene.

Williams was convicted of capital murder and sentenced to death.  The Texas Court of Criminal Appeals affirmed the conviction and sentence, Williams v. State, No. 73,796 (Tex. Crim. App. 2002), and denied his application for postconviction relief, Ex Parte Williams, No. 50,662-01 (Tex. Crim. App. 2003).

On June 20, 2002, the Supreme Court of the United States found a national consensus against the execution of mentally retarded defendants and held that the Eighth Amendment barred such punishment.  Atkins v. Virginia, 536 U.S. 304 (2002).

On June 17, 2003, Williams filed a successive state habeas application contending that he is mentally retarded, that the Eighth Amendment, as interpreted in Atkins, bars his execution, and that his sentence violates the Sixth Amendment because the jury did not determine that he is not mentally retarded.  The Texas Court of

2

Criminal Appeals found that Williams failed to make a prima facie showing of mental retardation and dismissed the application as an abuse of the writ.  Ex Parte Williams, No. 50,662-02 (Tex. Crim. App. 2003).  Williams raised these issues in his present federal habeas petition.

In its July 15, 2005 Order, the court found that the state court's conclusion that Williams failed to make a prima facie showing of mental retardation was unreasonable:

> [T]he state habeas court's conclusion that Williams failed to plead sufficient facts to make a prima facie case of mental retardation "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  The American Association on Mental Retardation ("AAMR") defines mental retardation as (1) sub-average general intellectual functioning; (2) related limitations in two or more of the following adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work; and (3) onset before the age of 18.  R. Luckasson, et al., Mental Retardation: Definition, Classification, and Systems of Supports (9th ed. 1992)("The Red Book").
>
> While the state court was correct in noting that Williams did not present a specific diagnosis of mental retardation before the age of 18, Williams undeniably presented evidence of a full scale IQ in the mildly retarded range that was so identified by testing before he turned 18, and of significant deficits in adaptive functioning before age 18.  The Court of Criminal Appeals' insistence on the incantation of the specific phrase "mentally retarded" in light of substantial evidence that Williams met a clinical definition of mental retardation was simply unreasonable.  Therefore, the Court of Criminal Appeals' conclusions on this issue are not entitled to deference under the [Anti-Terrorism and Effective Death Penalty Act].[2]

---

[2]     The Anti-Terrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2254(d) ("AEDPA").

3

Docket Entry No. 39.  Accordingly, the court ordered an evidentiary hearing on the issue of whether Williams is mentally retarded.

## II.  __Legal Standards__

Federal law authorizes habeas relief "only on the ground that [an inmate] is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  The Supreme Court's holding in <u>Atkins</u> that the Eighth Amendment exempts the mentally retarded from execution represents the primary federal law applicable in this case.  Under the Eighth Amendment's "evolving standards of decency" review, the Supreme Court found that "death is not a suitable punishment for a mentally retarded criminal."  <u>Atkins</u>, 536 U.S. at 321.  The Supreme Court, however, approached the birth of this new constitutional rule with caution. While acknowledging that prevalent societal norms protected the mentally retarded, the Supreme Court declined to announce a bright-line exception.  Instead of creating a definitive test to determine ineligibility for death, the Supreme Court allocated "'to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences.'" <u>Atkins</u>, 536 U.S. at 317 (quoting <u>Ford v. Wainwright</u>, 477 U.S. 399, 416-17 (1986)); <u>see also</u> <u>Moore v. Quarterman</u>, 454 F.3d 484, 493 (5th Cir. 2006) ("[T]he <u>Atkins</u> Court did not adopt a particular criteria for determining whether a defendant is mentally retarded[.]").

Since <u>Atkins</u>, the Texas Court of Criminal Appeals has developed standards by which it evaluates a death-sentenced

inmate's claim of retardation.  In Ex parte Briseno, 135 S.W.3d 1, 8 (Tex. Crim. App. 2004), the Court of Criminal Appeals decided that "[u]ntil the Texas legislature provides an alternative definition of 'mental retardation' for use in capital sentencing," Texas courts will adjudicate Atkins claims under the framework established by the American Association on Mental Retardation ("AAMR"), in conjunction with those standards contained in Texas' Persons with Mental Retardation Act ("PMRA"), Tex. Health & Safety Code § 591.003(13).[3]  Specifically, Briseno echoed the AAMR's definition of mental retardation, as set out in Atkins:

> *Mental retardation* refers to substantial limitations in present functioning. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. Mental retardation manifests before age 18.

Atkins, 536 U.S. at 309 n.3 (quoting The Red Book 5).[4]  The PMRA, which differs only slightly from the AAMR statement, defines mental

---

[3]    In addition to the AAMR's definition, the Atkins Court also referenced the American Psychiatric Association's ("APA") definition of mental retardation. See Atkins, 536 U.S. at 309 n.3 (quoting Diagnostic and Statistical Manual of Mental Disorders 41 (4th ed. 2000)("DSM-IV")).  The Briseno opinion did not rely on the APA standards.  The APA and AAMR standards for mental retardation, however, contain substantially the same criteria for determining mental retardation.  See Atkins, 536 U.S. at 309 n.3 (noting the similarity between the professional standards).

[4]    The Atkins Court relied on the ninth edition of The Red Book in defining mental retardation.  In May 2002, the AAMR released a tenth edition of The Red Book that modified its definition of mental retardation: "Mental retardation is a disability characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills.  This disability originates before age 18."  AAMR, The Red Book 1 (10th ed. 2002).

retardation as "significantly subaverage general intellectual functioning that is concurrent with deficits in adaptive behavior and originates during the developmental period." Tex. Health & Safety Code § 591.003(13).

Taken together, the AAMR and the PMRA contain three indispensable components: (1) "significantly subaverage" general intellectual functioning; (2) accompanied by "related" limitations in adaptive skill areas; and (3) the onset of which occurs before age 18. Williams must meet all three elements to show that his execution would violate the Constitution. See Clark v. Quarterman, 457 F.3d 441, 444 (5th Cir. 2006).

### III.  Evidence Adduced At The Evidentiary Hearing

#### 1.  Williams' School Records

Williams attended Houston Independent School District's Johnston Middle School, Ross N. Sterling High School and Robert E. Lee High School.[5]

##### A.  Middle School

The earliest school test records available for Williams are Metropolitan Achievement Test ("MAT")[6] scores recorded in middle school. During his middle school years, Williams was in a regular classroom.

---

[5]    Williams' school records are found at Respondent's Exhibit, ("R. Ex.") 1.

[6]    The MAT is a nationally-normed test that compares the student to his peers across the country. Evidentiary Hearing Transcript, ("EH"), Vol. 4, p. 226, Testimony of James Claypool.

In a MAT test administered in April 1988, when Williams was twelve years old and nearing the end of his sixth grade year, Williams performed at the grade equivalents in the areas tested as follows:[7]

| | |
|---|---|
| Vocabulary | 6.9 |
| Reading Comprehension | 5.3 |
| Math Concepts | 7.8 |
| Math Problem Solving | 5.3 |
| Math Computation | 7.4 |
| Spelling | 11.1 |
| Language | 6.8 |
| Science | 7.3 |
| Social Studies | 6.0 |
| Research Skills | 4.9 |
| Total Reading | 5.7 |
| Total Math | 6.8 |
| Total Language | 7.8 |
| Total Basic Battery | 6.7 |
| Total Complete Battery | 6.7 |

In a MAT test administered in April 1989, when Williams was thirteen years old and nearing the end of his seventh grade year, Williams performed at the grade equivalents in the areas tested as follows:[8]

| | |
|---|---|
| Vocabulary | 5.8 |
| Reading Comprehension | 6.2 |
| Math Concepts | 6.9 |
| Math Problem Solving | 5.7 |
| Math Computation | 7.3 |
| Spelling | Post-high school |
| Language | 6.4 |
| Science | 10.3 |
| Social Studies | 5.6 |
| Research Skills | 5.9 |
| Total Reading | 6.1 |
| Total Math | 6.6 |
| Total Language | 8.1 |

---

[7]    R. Ex. 1, p. 9.

[8]    Id.

```
Total Basic Battery          6.9
Total Complete Battery       7.0
```

Williams took the TEAMS test[9] in seventh grade; his scores reflected subject mastery in mathematics, reading and writing.[10]

In a MAT test administered in April 1990, when Williams was fourteen years old and nearing the end of his eighth grade year, Williams performed at the grade equivalents in the areas tested as follows:[11]

```
Vocabulary                   6.1
Reading Comprehension        8.0
Math Concepts                9.0
Math Problem Solving         6.9
Math Computation             6.3
Spelling                    10.9
Language                    10.4
Science                      9.8
Social Studies               6.2
Research Skills              6.8
Total Reading                7.5
Total Math                   7.6
Total Language              10.8
Total Basic Battery          8.3
Total Complete Battery       8.1
```

B.  High School - Ninth Grade

Williams attended Ross N. Sterling High School for ninth grade. In October 1990, Williams passed the Texas Assessment of Academic Skills ("TAAS") test in reading and writing but failed the mathematics portion.[12]  Later that academic year, in April 1991,

---

[9]    This is a State of Texas-mandated test assessing academic competency at certain grade levels.

[10]    R. Ex. 1, p. 9.

[11]    Id.

[12]    R. Ex. 1, pp. 7, 10.

Williams took the MAT and scored as follows:[13]

| | |
|---|---|
| Vocabulary | 8.8 |
| Reading Comprehension | 10.8 |
| Math Concepts | 9.0 |
| Math Problem Solving | 6.0 |
| Math Computation | 7.3 |
| Spelling | Post high school |
| Language | 8.3 |
| Science | 10.3 |
| Social Studies | 7.8 |
| Research Skills | 9.7 |
| Total Reading | 9.9 |
| Total Math | 7.5 |
| Total Language | 10.7 |
| Total Basic Battery | 9.0 |
| Total Complete Battery | 8.8 |

Williams earned the following grades in regular classes in fall semester: English IA (74), Creative Writing (67), Pre-Algebra A (77), Physical Science (75), U. S. History A (77), and Physical Education A (79).[14]   In the spring semester, the following grades were reported in regular classes: English IB (67), Technical Writing (69), Pre-Algebra B (75), Physical Science B (74), U. S. History B (77) and Physical Education B (84).[15]

C.   <u>Tenth Grade</u>

Williams began tenth grade at Ross N. Sterling High School. He earned the following final grades in regular classes fall semester: English IIA (74), Algebra IA (67), Biology IA (71), Physical Education A (85) PTS A (77), and Chemistry B (80).[16]

---

[13]   R. Ex. 1, p. 7.

[14]   R. Ex. 1, p. 2.

[15]   <u>Id.</u>

[16]   <u>Id.</u>

In January 1992, Williams was removed from Ross N. Sterling High School at his parents' request due to behavioral and peer problems. He received a hardship transfer to Robert E. Lee High School, where he earned the following grades for the first two six-week grading periods: English I B (80, 72), Algebra I A (60, 50), Biology I B (65, 70), Manufacturing Systems I B (80, 52), Coed PE (100, 90), and Coed Health (82, 50).[17] Notably, his report card indicated that he was absent twenty days from Manufacturing Systems and absent nine days from Algebra I during the second six-week period.[18]

James Claypool was the principal at Robert E. Lee High School during Williams' high school years.[19] Claypool described Williams as soft-spoken and respectful, but prone to getting into trouble when not supervised by an authority figure.[20] Claypool described Williams as being fascinated by crime and criminals and gravitated toward those peers who engaged in criminal activities.[21] Claypool stated that Williams often informed school officials of his friends' illegal activities and then returned to his friends and told them what he had just done. As a result, Williams was frequently beaten

---

[17]    R. Ex. 1, p. 5.

[18]    Id.

[19]    EH, Vol. 4, p. 221.

[20]    EH, Vol. 4, p. 222.

[21]    EH, Vol. 4, pp. 222-23.

up by his friends.[22]  Claypool often counseled Williams about this attention-getting/self-destructive behavior, but Williams was unable to stop the cycle of informing on his friends and then informing on himself.[23]  This behavior continued until Williams was moved to a different classroom.[24]

Claypool testified that he did not interact with Williams as if he were mentally retarded.  Rather, Claypool considered him to be "bright," "socially skilled with adults," and "manipulative."[25] Williams was not considered to be mentally retarded academically and was not placed in classes for the mentally retarded.[26]

Claypool considered Williams "above average" in his dress and hygiene.[27]  Claypool testified that, while a teacher noted that Williams often wore a long coat to school, he did not observe that type of clothing when he saw Williams.  The teacher's note dated from a time when Williams was breaking into lockers.  Claypool believed that the long coat was worn to hide stolen items.[28]

D.  <u>West Oaks Hospital - Tenth Grade</u>

On April 20, 1992, Williams was admitted to West Oaks

---

[22]    EH, Vol. 4, p. 223.

[23]    EH, Vol. 4, p. 223.

[24]    EH, Vol. 4, p. 265.

[25]    EH, Vol. 4, p. 233.

[26]    EH, Vol. 4, p. 238.

[27]    EH, Vol. 4, p. 242.

[28]    <u>Id.</u>

psychiatric hospital after being expelled from Robert E. Lee High School for a series of locker thefts, setting a trash can on fire and truancy.[29]  Admission notes reflect that Williams' mother reported that Williams had been disruptive and impulsive and had a short attention span from grade school to the present.  In spite of this behavior, Williams had never been diagnosed as having an attention deficit/hyperactivity disorder ("ADHD") and did not have any documented learning disabilities.  Nursing notes at his admission indicated that Williams was casually dressed in jeans and a shirt, was clean, and gave minimal answers with a flat affect.[30]

While at West Oaks, Williams received counseling and attended group therapy sessions.  His goals were to follow rules and regulations, work on impulse control and peer relations, and modify his "street tough-guy persona."[31]  He, his parents, and the staff at West Oaks assessed his strengths as "street-wise," "verbal," "supportive family," and "verbalized desire to change."[32]  His problems, as perceived by himself, his family, and the West Oaks staff were "stealing," "poor peer group," "low self-esteem," "argumentative," "short attention span," "poor judgment," and "depression."[33]  Notes from his group therapy sessions reflected

---

[29]    West Oaks Hospital records, R. Ex. 2, p. 1; R. Ex. 1, p. 53.

[30]    R. Ex. 2, p. 16.

[31]    R. Ex. 2, p. 26.

[32]    R. Ex. 2, p. 29.

[33]    Id.

that he consistently had a flat affect and exhibited little or no progress.[34]  He was constantly cautioned about his use of curse words and appeared unable to accept "no" as an answer to something he wanted.[35]

Williams was diagnosed as having a conduct disorder and hyperactivity.[36]  He was prescribed medication for short attention span and impulsivity.[37]  The discharging physician recommended that Williams be tested for a learning disability in math.[38]  He was discharged on May 15, 1992.[39]  It was noted that Williams had made "marginal" improvements is his self-esteem and appeared less oppositional and defiant.[40]  It was recommended that Williams be placed in a structured residential program but his mother rejected that recommendation.[41]

Houston Independent School District maintained a community service campus at West Oaks Hospital.  While there, Williams completed the second semester of his tenth-grade coursework, passing

---

[34]    R. Ex. 2, pp. 52-57.

[35]    R. Ex. 2, p. 56.

[36]    R. Ex. 2, pp. 63-64.

[37]    Id.

[38]    Id.

[39]    Id.

[40]    R. Ex. 2, p. 64.

[41]    R. Ex. 2, pp. 55, 64.

Health (73), English I B (80),[42] and Biology I B (78).[43]  He failed Algebra I A.[44]  A teacher's note on May 15, 1992, indicated, "Jeffrey is starting to be disruptive."[45]

   E.   HISD Psychological-Educational Assessment

   On July 7, 1992, Williams, then age sixteen, was evaluated by Dr. Joyce Hood to determine his eligibility for special education services at Robert E. Lee High School.[46]  Dr. Hood noted that Williams' parents reported the following: "Jeffrey is not very talkative and is oppositional at times.  He has been a problem since kindergarten.  He is a habitual liar, has cut teachers' tires, and has stolen from stores in the mall.  He runs with a bad crowd and is easily influenced by them.  He shows no remorse for things he does."[47]

   Dr. Hood also noted that a teacher report stated that Williams "frequently demands the spotlight," "rarely listens," and "is easily distracted."[48]  That same report characterized Williams as having average organizational skills, an average ability to follow through

---

[42]     This was the second time Williams had taken the course.  He had failed it in ninth grade.

[43]     R. Ex. 1, p. 4.

[44]     R. Ex. 1, p. 4.

[45]     R. Ex. 2, p. 42.

[46]     R. Ex. 1, pp. 41-52.

[47]     R. Ex. 1, p. 42.

[48]     Id.

on assignments and adequate social skills.[49]

Dr. Hood administered the Wechsler Intelligence Scale for Children - III (WISC-III).[50] Williams scored a Verbal IQ of 79, a Performance IQ of 65 and a Full Scale IQ of 70.[51] The Full Scale IQ of 70 placed Williams in the second percentile relative to other sixteen-year olds. His Verbal IQ score placed him in the eighth percentile and his Performance IQ placed him in the first percentile.

Dr. Hood also administered several achievement tests:

<u>Woodcock-Johnson Tests of Achievement-Revised</u>

|  | Age Equiv. | Grade Equiv. | SS[52] | %tile |
|---|---|---|---|---|
| Battery Subtests |  |  |  |  |
| Letter-Word ID | 15-1 | 9.7 | 97 | 42 |
| Passage Comprehen. | 13-8 | 8.3 | 93 | 31 |
| Calculation | 18-8 | 11.4 | 103 | 58 |
| Applied Problems | 12-2 | 6.8 | 88 | 22 |
| Dictation | 14-1 | 8.9 | 94 | 34 |
| Proofing | 13-10 | 8.4 | 94 | 33 |
| Punctuation | 11-8 | 6.3 | 88 | 21 |
| Spelling | 17-4 | 11.6 | 102 | 55 |
| Usage | 15-10 | 10.4 | 99 | 47 |
| Battery Clusters |  |  |  |  |
| Broad Reading | 14.5 | 9.0 | 94 | 35 |
| Broad Mathematics | 14.3 | 9.0 | 94 | 35 |
| Basic Writing Skills | 14-0 | 8.7 | 93 | 33 |

<u>Wide Range Achievement Test - Revised (WRAT-R)</u>

| | | | | |
|---|---|---|---|---|
| Spelling | | 10 B | 95 | 37 |

Dr. Hood found that Williams' performance on the Woodcock-

---

[49]    <u>Id.</u>

[50]    R. Ex. 1, p. 43.

[51]    <u>Id.</u>

[52]    "SS" presumably means "scaled score." A scaled score is a conversion of a raw score on a test to a common scale that allows for numerical comparisons between students. The significance of these numbers was not discussed.

Johnson test indicated that his academic achievement in reading, math, and written language was above his assessed IQ level.[53]   In other words, while his IQ showed that he was in the second percentile intellectually, he functioned academically between the twenty-first and fifty-eighth percentiles.   Dr. Hood found that Williams' performance on the WRAT spelling test (thirty-seventh percentile) was significantly above his assessed intellectual level.[54] Dr. Hood's report offered no explanation for these apparent anomalies.

HISD only considered a Full Scale IQ score of 69 and below as mentally retarded, hence, Williams did not qualify for special education services based on his tested IQ.[55]   However, Dr. Hood concluded that Williams met the criteria for educational services based on his earlier diagnosis as emotionally disturbed, moderate severity.[56]   Notably, Williams was not diagnosed as either mentally retarded or learning disabled.

F.   <u>High School - Eleventh and Twelfth Grades</u>

In November 1992, an Admission, Review and Dismissal ("ARD") committee at Robert E. Lee High School met concerning Williams' Individual Educational Plan ("IEP") for academic year 1992-1993.[57]

---

[53]   R. Ex. 1, p. 46.

[54]   <u>Id.</u>

[55]   EH, Vol. 3, p. 102.

[56]   R. Ex. 1, pp. 46, 52.

[57]   R. Ex. 1, p. 73.

According to the IEP, Williams met the requirements for special education accommodations because of "ED" (presumably, emotionally disturbed). His IEP required him to take some classes in a regular classroom setting and others in a special education classroom setting, but all classes were taught at his grade level.[58]  The required modifications were: frequent breaks, defined physical space, cooling off period, positive reinforcers and behavior management systems.[59] He also was found to need a discipline management plan.  The ARD committee noted, "[A]t this time he is doing very well in all of his classes."[60]

In April 1993, Williams' IEP was modified and Williams was to be mainstreamed into some regular education classes in the fall semester at the eleventh-grade level.[61]  His IEP allowed additional study aids, preferential seating and test accommodations.  In May 1993, Williams passed the writing portion of the TAAS test, but failed the reading and mathematics portions.  As he was not required to take the TAAS test, there were no repercussions from the failures.  His eleventh-grade report card reflected many grades in the 90's.[62]  Williams earned an 89 in "Chemistry A," and had earned

---

[58]    While taught at the tenth-grade level, Williams had to master eighty percent of the Consumer Math coursework, seventy percent of the Geography course work, eighty percent of the C.L.A (language) coursework.  Williams did not earn sufficient credits to be considered a junior until spring semester 1993.

[59]    R. Ex. 1, p. 78.

[60]    R. Ex. 1, p. 79.

[61]    R. Ex. 1, p. 90.

[62]    R. Ex. 1, p. 2.

an 80 in "Chemistry B" the semester before.[63]

In November 1993, the ARD committee noted, "This is a program change ARD for Jeffrey.  Progress reports were reviewed and Jeffrey is progressing successfully."[64]  His IEP for his senior year indicated that his coursework was at the twelfth-grade level and that he was placed in four regular classes in the fall semester and five regular classes in the spring semester.[65]  In the first six-week reporting period ending October 1993, Williams earned a 90 in Support Services, a 76 in U. S. Government and a 91 in Intro World AG.[66]

As his senior year was coming to a close, there was a deterioration in Williams' behavior.  A teacher noted on January 26, 1994, "I am having problems with Jeffrey Williams in my sixth period English II B class.  He is not cooperative or responsive in a positive way.  Today, I asked him to step outside so that I could speak to him, he wandered off and never returned to class."[67] Several months later, the ARD committee noted that another teacher reported misbehavior by Williams.[68]  His grades in regular English

---

[63]    Id.; see also, EH, Vol. 4, p. 235, Testimony of James Claypool. According to Claypool, these grades were earned in a regular classroom setting. EH, Vol. 4, p. 267.  Chemistry was not taught in a special education classroom setting.  EH, Vol. 4, p. 268.

[64]    R. Ex. 1, p. 98.

[65]    R. Ex. 1, p. 100.

[66]    R. Ex. 1, p. 6.

[67]    R. Ex. 1, p. 103.

[68]    R. Ex. 1, p. 107.

and government classes were in the 70-71 range, while his grades in special education classes were in the high 80's.[69]

Williams graduated from Robert E. Lee High School on June 3, 1994, with a grade point average of 2.19 and a class rank of 326 in a class of 480.[70]

2. <u>Williams' Childhood Friends</u>

A number of witnesses testified about Williams' odd behavior as a child and later as a teenager. The testimony follows:

A. <u>Dana McCann</u>

Dana McCann ("McCann") testified that he grew up in the Gulf Meadows neighborhood where Williams also lived.[71] McCann, being several years older than Williams, characterized his exposure to Williams as "limited" in both grade school and in the neighborhood.[72] McCann stated that he observed other children "popping" Williams in the head or "thumping" him on his ears in elementary school.[73] McCann never saw Williams try to defend himself, nor did he ever see Williams act aggressively toward other children. McCann also observed Williams walking around and talking to himself.[74]

On those occasions when Williams tried to play with McCann's

---

[69]   R. Ex. 1, p. 2.

[70]   <u>Id.</u>

[71]   EH, Vol. 1, p. 10.

[72]   EH, Vol. 1, pp. 11-12.

[73]   EH, Vol. 1, p. 12.

[74]   <u>Id.</u>

friends, Williams did not follow the rules of the game.  As an example, McCann stated that Williams would throw the ball over a neighbor's fence during a game of kickball, or kick the ball during a game of basketball.[75]  Even after someone explained the game to Williams, he still failed to play according to the rules, and as a result, no one wanted Williams on his or her team.[76]  In grade school, Williams was called "stupid," "ignorant," and a "dunce."[77] McCann recalled that when he would return after school to his neighborhood, he often heard that someone had beaten up Williams that day.[78]

McCann also observed that Williams wore inappropriate clothing, such as church clothes to play sports, at seven or eight years old, and, as a teenager, an overcoat with a hood during a Houston summer, or shorts and a t-shirt in the winter.[79]  Williams also appeared unkempt.  McCann observed Williams, then sixteen or seventeen years of age, on several occasions at 2:00 or 3:00 a.m., sitting on the street corner by himself.[80]

    B.  <u>Wayne Russell Wade, Jr.</u>

Wayne Russell Wade, Jr., ("Wade") also grew up in the same

---

[75]    EH, Vol. 1, p. 14.

[76]    EH, Vol. 1, p. 15.

[77]    EH, Vol. 1, p. 16.

[78]    EH, Vol. 1, p. 15.

[79]    EH, Vol. 1, pp. 18-19. 25-26.

[80]    EH, Vol. 1, p. 26

neighborhood as Williams.[81]  Wade was in the same grade as Williams and considered him a friend.[82]  Wade at first corroborated McCann's testimony that Williams never caught on to the rules of games.[83]  However, on cross-examination, he admitted that Williams played sports with other boys, got picked for teams because he was fast, and understood the rules of the game.[84]

Wade testified that Williams was gullible and would always accept a dare.[85]  When Williams was about eight years old, Wade observed him attach firecrackers to a dog or cat's back and attempt to light them on a dare.[86]  That is when Wade realized that there was something "wrong" with Williams.[87]  According to Wade, Williams did not like being told what to do.[88]  Wade also thought that Williams' hygiene was "pretty good."[89]  By the time Wade was in high school, he realized that Williams was functioning at a lower intellectual level than other people.[90]

---

[81]    EH, Vol. 1, p. 35.

[82]    EH, Vol. 1, p. 34.

[83]    EH, Vol. 1, p. 35.

[84]    EH, Vol. 1, pp. 40, 52.

[85]    EH, Vol. 1, p. 50.

[86]    Id.

[87]    Id.

[88]    EH, Vol. 1, p. 46.  As an example, Wade related that in middle school Williams stole a teacher's grade book because he was mad at her.

[89]    EH, Vol. 1, p. 45.

[90]    EH, Vol. 1, p. 48.

C. <u>Ron Johnson, Jr.</u>

Ron Johnson, Jr., ("Johnson") attended the same church as the Williams family.[91] At some point when both Johnson and Williams were in high school, Johnson's mother suggested that Johnson befriend Williams as Williams had few friends.[92]  Johnson struck up a friendship with Williams during Sunday school and bible study.[93]  At first, Williams was very quiet and rarely made eye contact with Johnson.[94]  Eventually, Williams began spending weekends at the Johnson home and spending time with Johnson and his friends.[95]

Johnson described Williams as emotionally insightful.[96] Williams' vocabulary was very basic, "on the level of a ninth or tenth grade student at best."[97] According to Johnson, Williams could not keep up with the group's roundtable discussions on various topics, which Johnson characterized as at a college level.[98]  When Williams was unable to keep up with conversations Johnson and his friends had about books and ideas, he would make "totally inappropriate" remarks to the subject matter.[99]  When he became

---

[91]    EH, Vol. 1, p. 57.

[92]    <u>Id.</u>

[93]    EH, Vol. 1, p. 58.

[94]    EH, Vol. 1, pp. 57-58.

[95]    <u>Id.</u>

[96]    EH, Vol. 1, p. 59.

[97]    EH, Vol. 1, p. 60.

[98]    EH, Vol. 1, p. 151.

[99]    EH, Vol. 1, p. 87.

excited, he would often yell out certain phrases because other words failed him.[100]  Yelling out became Williams' trademark and he did it often to obtain the laughter of the group.[101]

Johnson never saw Williams read a book or give any indication through conversation that he ever read a book.[102]  Williams was always a follower but had difficulty in modifying his behavior in social situations.[103]  Johnson stated that it was difficult for Williams to pay attention and not to engage in attention-getting behavior during bible study classes.[104]  On one occasion, at church, Williams announced to the minister and Johnson's mother that he had had sex, using a vulgarity to describe it.[105]  Johnson also testified that when Williams provoked others to hurt him, Johnson would have to extricate Williams from the situation and counsel him on his disrespectful or antagonistic behavior.[106]  On those occasions, Williams responded meekly.[107]  Johnson also characterized Williams as generally "hyperactive" when he was with his friends, but whenever Williams was in an uncomfortable situation, he would become

---

[100]  EH, Vol. 1, p. 61.

[101]  Id.

[102]  EH, Vol. 1, p. 62.

[103]  EH, Vol. 1, p. 65.

[104]  EH, Vol. 1, p. 68.

[105]  EH, Vol. 1, p. 114.

[106]  EH, Vol. 1, pp. 74-75.

[107]  EH, Vol. 1, p. 76.

introverted and have very little to say.[108]

Johnson testified that Williams did not bathe or brush his teeth regularly during the weekends he spent at Johnson's home; Johnson or Johnson's parents had to remind Williams to shower and change clothes for church.[109] Williams was able to perform household chores, such as making his bed, when told to do so.[110] Johnson stated that when the group played basketball, Williams would pick up the ball, hurl it at the backboard and then run off.[111]

Johnson admitted that this group of friends engaged in underage drinking and smoking marijuana.[112] Williams told Johnson that Ganksta Nip[113] was his role model, and Johnson believed that Williams had memorized all his songs.[114] Johnson observed Williams smoking marijuana and "fry" or "amp," that is, marijuana rolled into a cigar blunt, laced with embalming fluid, and then baked.[115] This process amplified the effect of the drug.[116]

Johnson conceded that, at the time, the group thought that

---

[108]    EH, Vol. 1, p. 138.

[109]    EH, Vol. 1, pp. 76-78.

[110]    EH, Vol. 1, p. 83.

[111]    EH, Vol. 1, pp. 80-81.

[112]    EH, Vol. 1, pp. 109-10.

[113]    Ganksta Nip is a Houston-based rapper known for his hard-core sexual and violent lyrics.  EH, Vol. 1, pp. 131-34.

[114]    EH, Vol. 1, p. 132.

[115]    EH, Vol. 1, pp. 133, 177.

[116]    EH, Vol. 1, p. 133.

24

Williams was funny.[117]    Johnson also agreed that Williams often engaged in humorous behavior to become the focus of attention.[118] Johnson stated, "[Humor] was his contribution to the group."[119]    As an example, he stated that the group initially found it funny that Williams had set a fire at Sterling High School, called in a false alarm to the fire department, pulled a fire alarm at a McDonald's restaurant and wore Johnson's mother's wig and clothing while smoking a marijuana cigarette.[120]    Telling, however, was this statement:

> At the time, in our youth between sixteen and seventeen, we just assumed that Jeffrey was a little slow but responsible enough to understand what was going on around him until a couple of incidents occurred while we were teenagers that made us realize that Jeffrey was not as sane as the rest of us.   The term we used back then, 'Jeffrey's crazy,' and not just in a humorous way."[121]

When asked if he used the terms "sane" and "crazy" in terms of mental illness, Johnson responded in the affirmative.[122]

Williams kept in touch with Johnson while Williams was in the Navy, twice calling Johnson from out of the country.[123] Williams told Johnson he had a girlfriend in Japan but Johnson doubted the

---

[117]    EH, Vol. 1, p. 125.

[118]    EH, Vol. 1, p. 103.

[119]    EH, Vol. 1, p. 156.

[120]    EH, Vol. 1, pp. 124-26, 128-29.

[121]    EH, Vol. 1, p. 163.

[122]    EH, Vol. 1, p. 164.

[123]    EH, Vol. 1, p. 142.

veracity of that statement.[124]  Johnson also testified that Williams
"always" had marijuana and at least a quarter tank of gas, no matter
how little money he had.[125]

    D.  <u>Reginald Tolbert</u>

Reginald Tolbert ("Tolbert") met Williams through his
friendship with Ron Johnson, between the ages of thirteen and
sixteen.[126]  Tolbert was approximately two years younger than
Williams.[127]  Tolbert corroborated Johnson's description of Williams'
interactions with the group:  Williams had trouble communicating,
stayed on the periphery during basketball games and discussions, but
was a loyal member of the group.  Williams enjoyed making the others
laugh by repeating certain phrases, which had no purpose other than
to get a laugh.[128]  While in high school, the group, including himself
and Williams, drank alcohol and smoked marijuana.[129]  Tolbert admitted
that he had heard Williams talk about "doing amp."[130]  Tolbert felt
protective of Williams because Williams was "slow."[131]

    E.  <u>Devin Wilburn</u>

Devin Wilburn ("Wilburn") was also part of Ron Johnson's group

---

[124]   <u>Id.</u>

[125]   EH, Vol. 1, p. 144.

[126]   EH, Vol. 1, p. 199.

[127]   EH, Vol. 1, p. 202.

[128]   EH, Vol. 1, p. 212.

[129]   EH, Vol. 1, p. 243.

[130]   <u>Id.</u>

[131]   EH, Vol. 1, p. 226.

of friends and met Williams on the weekends at Johnson's house.  He agreed with Johnson and Tolbert's assessment that Williams was not very good at playing videogames.[132]  When the group entertained itself by making up raps, Williams attempted to participate, was unsuccessful and, eventually, just listened to the others.[133] Williams rarely played basketball with the group.[134]  Wilburn recalled that on the one occasion that Williams did play basketball with the group, he grabbed the ball and ran in the wrong direction to everyone's laughter.[135]

Wilburn also corroborated Johnson's testimony that Williams would blurt out statements that were not related to the conversation for the purpose of making the group laugh.[136]

3.  <u>Williams' Military Service</u>

Williams' military service records reflect that Williams enlisted in the Naval Reserve in February 1994, during his senior year in high school.[137]  He reported for active duty in July 1994 to the Recruit Training Command in Great Lakes, Illinois.[138]

A.  <u>Boot Camp</u>

---

[132]    EH, Vol. 1, p. 278-79.

[133]    EH, Vol. 1, p. 281-82.

[134]    EH, Vol. 1, p. 284.

[135]    <u>Id.</u>

[136]    EH, Vol. 1, p. 287.

[137]    R. Ex. 3, pp. 1-9.

[138]    R. Ex. 3, p. 22.

27

Dwalon Youngblood ("Youngblood") testified via a videotaped deposition. Youngblood stated that he was in the same Navy boot camp company as Williams.[139] Williams had begun boot camp several weeks earlier than Youngblood, but had been held back because he failed a test.[140] Williams had little problem with the physical demands of boot camp, but was one of several who struggled with boot camp academics.[141] Youngblood and others in the company helped Williams study so that he could complete boot camp with the group.[142] Even so, Williams did not take the academics as seriously as everyone else.[143]

Although Williams knew how to make his bed, clean the toilets, and do other cleaning-type work, he never did it unless someone told him to do it and, even then, he often questioned why he was being singled out for the assignment.[144] Youngblood testified that, in boot camp, when one person did not do his job or did it incorrectly, the group was punished as a whole. As a result, he and other members of the company did a large percentage of Williams' work for him so the group would not be punished.[145]

---

[139]    EH, Vol. 2, p. 10.

[140]    Id.

[141]    EH, Vol. 2, pp. 14, 18, 20.

[142]    EH, Vol. 2, p. 19.

[143]    EH, Vol. 2, p. 21.

[144]    EH, Vol. 2, p. 84.

[145]    EH, Vol. 2, p. 25.

After boot camp, Youngblood and Williams went to seaman apprentice school, where they learned how to paint and perform maintenance on Navy vessels. Youngblood helped Williams study, but stated that it was not as difficult to get him to study in seaman apprentice school as in boot camp.[146] Williams was able to master the material, but "he would do things in his own way."[147]

Youngblood also related that once, instead of calling a cab or catching a bus to get to the nearest mall, Williams rented a limousine.[148]

After they finished seaman apprentice school, Williams was assigned to the U.S.S. Mobile Bay and Youngblood was assigned to a shipyard in Bremerton, Washington.[149] Youngblood did not hear from Williams during his naval service.[150]

DeMarcus Braggs ("Braggs") testified that he served in the same unit as Williams in Navy boot camp. They were also in the same study group.[151] Braggs testified that Williams was a "little slower to catch on" than the rest of the group and required more drilling on the material.[152] Williams also had difficulty meeting Navy

---

[146]    EH, Vol. 2, p. 31.

[147]    EH, Vol. 2, p. 32.

[148]    EH, Vol. 2, pp. 26-27.

[149]    EH, Vol. 2, p. 33.

[150]    EH, Vol. 2, p. 34.

[151]    EH, Vol. 3, pp. 13-17.

[152]    EH, Vol. 3, p. 17.

standards for neatness; Williams tried to comply but would always have something out of place and the entire company would be punished.[153] For example, Williams might have folded his shirt incorrectly, put on a wrinkled uniform or overlooked some other requirement that drew the criticism of the company commander.[154] As a result, Williams felt picked on.[155]  Braggs did not consider Williams to be mentally retarded, but thought that he was unable to pay attention to detail.[156]  He testified that Williams had a good sense of humor, liked to tell jokes and laughed when others told jokes.[157]

B.  U.S.S. Mobile Bay

After boot camp and other training, Williams was assigned to the U.S.S. Mobile Bay.  His peers and supervisors had mixed assessments of Williams' capabilities.

1.  Alexander Lee

Alexander Lee ("Lee") served on the U.S.S. Mobile Bay as a lead petty officer.[158]  The ship was in dry dock when Williams first reported for duty and Williams was assigned to the deck division,

---

[153]   EH, Vol. 3, pp. 23-24.

[154]   EH, Vol. 3, p. 45.

[155]   Id.

[156]   EH, Vol. 3, p. 29.

[157]   EH, Vol. 3, pp. 35, 58.

[158]   EH, Vol. 2, p. 192.

30

which placed him under the supervision of Lee.[159]  Lee testified that
when the ship was in dry dock, deck division seamen were assigned to
fire watch or other unskilled tasks, such as painting the ship,
replacing non-skid deck material, or scraping rust off the ship's
hull.[160]  When the ship was at sea, Williams' responsibilities also
included standing watch.[161]  Lee testified that he directly supervised
Williams for two or three months.[162]  Williams was generally "good"
at the jobs assigned to him but was often found asleep or day-
dreaming.[163]  He was occasionally reprimanded for this conduct and
assigned extra military instruction, or, in layman's terms, extra
work.[164]

Once the ship was at sea, Williams also served as helmsman, a
job that involved following directions to steer the ship, or
adjusting the speed of the ship.  Lee testified that this job did
not require the exercise of discretion.  The helmsman was merely to
follow an officer's order to turn the ship a certain number of
degrees in a certain direction, or move a lever from one notch to
another to adjust the ship's speed.[165]  On one occasion, Williams

---

[159]    Id.

[160]    EH, Vol. 2, pp. 193-99.

[161]    EH, Vol. 2, pp. 197-98.

[162]    EH, Vol. 2, pp. 195, 218.

[163]    EH, Vol. 2, p. 201.

[164]    EH, Vol. 2, pp. 201-02.

[165]    EH, Vol. 2, p. 200.

caused the ship to "roll" by turning the wheel too quickly.[166]  On the positive side, Lee stated that Williams did not make a lot of mistakes while performing as helmsman, and he considered Williams an average to above average performer at that task.[167]  According to Lee, Williams was able to understand, follow, and remember instructions.[168]

Lee ranked Williams "towards the bottom" in terms of understanding and carrying out his other responsibilities among the hundreds of seamen he has supervised.[169]  Lee also opined that he would give Williams an overall grade of "C" for his job performance, but also noted that Williams was disciplined a number of times for his job performance.[170]

According to Lee, Williams lacked "military bearing," meaning, that he did not carry himself in a military fashion, did not salute properly to senior personnel and failed to observe the courtesies demanded in a military situation.[171]  He was habitually late or sloppily attired for the daily briefing by the lead petty officer.[172] Lee testified that Williams complained that he was being singled out or picked on by his superior officers.[173]  When told to correct a

---

[166]  EH, Vol. 2, p. 235.

[167]  EH, Vol. 2, p. 239.

[168]  EH, Vol. 2, p. 240.

[169]  EH, Vol. 2, p. 256.

[170]  EH, Vol. 2, p. 213.

[171]  EH, Vol. 2, pp. 241-42.

[172]  EH, Vol. 2, p. 242.

[173]  EH, Vol. 2, p. 216.

deficiency, Williams would sometimes get angry, have a temper tantrum, and either hide for several hours or simply ignore the instruction.[174]

Lee related an incident when Williams was required to attend a Captain's Mast,[175] and the captain questioned Williams about his rank, because it appeared that he was wearing a uniform with an incorrect rank. Williams could not tell the captain if he was a Seaman or a Seaman Apprentice because others addressed him using both titles.[176] Lee and other sailors perceived Williams as having low intelligence.[177] As a result, Williams was often assigned simple tasks.[178] Williams was also the target of practical jokes by other sailors.[179] Williams' jokes were immature or not appropriate to the situation.[180]

Lee also testified that he observed Williams wearing inappropriate clothing for the weather or wearing civilian clothes under his uniform or a sweatshirt with a hood in hot weather.[181] Lee considered Williams' behavior on shore leave to be unusual; instead

---

[174]    EH, Vol. 2, pp. 243-44.

[175]    A Captain's Mast is a non-judicial forum to resolve infractions of the Military Code of Justice.

[176]    EH, Vol. 2, pp. 203-04.

[177]    EH, Vol. 2, p. 204.

[178]    Id.

[179]    EH, Vol. 2, p. 205.

[180]    EH, Vol. 2, p. 207.

[181]    EH, Vol. 2, p. 205. Lee testified that Williams wore civilian clothes under his uniform in cold weather as well. Id. at p. 248.

of going to a bar or club while in a foreign port, Williams rode around with a jitney bus driver all day.[182]  Lee observed Williams sitting too close to a Japanese citizen on a train and staring at him, which prompted Lee to counsel Williams on socially acceptable behavior in Japan.[183]

### 2.  Wayne Johnson

Wayne Johnson ("Chaplain Johnson") served as a chaplain's assistant on the U.S.S. Mobile Bay during Williams' tour of duty.[184] Williams told Chaplain Johnson that his goal was to make a career in the Navy.[185]  Williams volunteered to work on community relations projects, such as performing maintenance on an orphanage, when the ship was overseas.[186]  Chaplain Johnson observed that Williams performed his shipboard duties capably and seemed to get along with other sailors on board.[187]  Chaplain Johnson testified that when Williams first came on board, he was a "star performer," but after a while his performance deteriorated to average.[188]  While many of the young sailors in Williams' division were the targets of practical jokes and other harassment, Williams fell for the jokes more than

---

[182]    EH, Vol. 2, p. 209.

[183]    EH, Vol. 2, pp. 209-10.

[184]    EH, Vol. 5, p. 7.

[185]    EH, Vol. 5, p. 9.

[186]    EH, Vol. 5, pp. 12-13.

[187]    EH, Vol. 5, pp. 10, 14, 16, 17.

[188]    EH, Vol. 5, p. 18.

others, and was therefore targeted more frequently.[189]   Chaplain
Johnson did not perceive Williams as mentally retarded.[190]

### 3.  Edward Robert Moore, Jr.

Edward Robert Moore, Jr. ("Moore") was one of Williams'
supervisors on the U.S.S. Mobile Bay.  He opined that Williams was
capable of carrying out his duties on the ship, but did not always
do so.[191]  Williams also had a poor attitude toward authority figures.
Moore ranked Williams in the middle of the pack among the hundreds
of sailors he supervised during his career, having an average
ability and intellect, but evidencing a below average attitude
toward authority.[192]

### 4.  Donald Holland

Donald Holland served on the U.S.S. Mobile Bay and was a lead
petty officer in Williams' division.[193]  Holland testified that
Williams had a poor attitude and, in his opinion, did not want to
work.[194]  Holland described Williams as immature, but possessing
average intelligence for sailors his age and at his level.[195]  Holland
reported that he had to discipline Williams for leaving his duty

---

[189]   EH, Vol. 5, pp. 26-27, 34-36.

[190]   EH, Vol. 5, p. 17.

[191]   EH, Vol. 5, p. 94.

[192]   EH, Vol. 5, pp. 95, 100, 109-10.

[193]   EH, Vol. 5, p. 66.

[194]   EH, Vol. 5, p. 66.

[195]   EH, Vol. 5, p. 67.

station and not stowing all his gear properly.[196]

Holland testified that Williams exhibited no respect for authority figures and spoke openly about his lack of respect for the chain of command.[197] Holland also testified that Williams appeared to keep himself clean; he never had to remind Williams to take a shower or noticed that he had a dirty uniform or body odor.[198]

### 5. Thomas Beard

Thomas Beard was also a lead petty officer on the U.S.S. Mobile Bay. He testified that Williams came to the U.S.S. Mobile Bay with a "tough guy," "I'm going to makeup my own mind," attitude, but he eventually adapted and, after receiving counselings and disciplinary actions, performed at an acceptable or, in some cases, above-average, level.[199] Beard testified that he had problems with Williams' military bearing and cleanliness, but characterized these deficiencies as "very common" for all deck seaman.[200] Beard clarified that a deck seaman who was dirty was probably doing his job; a deck seaman who was clean was probably lazy.[201] A deck seaman who had a body odor had poor hygiene. He never noticed that Williams had a

---

[196]   EH, Vol. 5, pp. 70-71.

[197]   EH, Vol. 5, pp. 75-76.

[198]   EH, Vol. 5, pp. 77, 87-88.

[199]   EH, Vol. 5, pp. 132, 134.

[200]   EH, Vol. 5, p. 146.

[201]   EH, Vol. 5, p. 156.

body odor.[202]  Beard never observed Williams wearing civilian clothes underneath his Navy uniform.

Beard stated that Williams obtained a number of "qualifications" including that of helmsman.[203]  Beard testified, in contradiction to Lee's opinion, that serving as helmsman on a ship was not easy; it involved following orders and adjusting to weather conditions.[204]  Beard admitted that he had, at one time, his helmsman qualifications revoked and stated that this was not unusual.[205]  Although Williams was, in Beard's opinion, improving in his performance as a sailor, his past disciplinary record and reputation with the upper chain of command hurt his chances to obtain a lesser punishment for the incident which eventually caused his separation from the Navy.[206]  Beard did not believe that Williams was mentally retarded.[207]

### 6.  George Mahon

George Mahon was the Operations Officer on the U.S.S. Mobile Bay and held the rank of Lieutenant Commander during Williams' tour of duty.  Mahon testified that Williams' job performance improved from unacceptable to below average during his tenure.  Mahon opined

---

[202]    Id.

[203]    Williams' helmsman qualifications were revoked on September 24, 1995, after he was found steering twelve degrees off course.  See R. Ex. 3, p. 34.

[204]    EH, Vol. 5, pp. 138-41.

[205]    EH, Vol. 5, p. 145.

[206]    EH, Vol. 5, pp. 143-44.

[207]    EH, Vol. 5, p. 149.

that Williams' poor performance was a result of his lack of desire, not lack of ability.[208]  He believed that Williams had the mental ability to do the jobs required of him.[209]  Because of Williams' poor attitude about work, Mahon recommended to the administrative separation board that Williams be discharged from the Navy.[210]  Mahon testified that he did not believe Williams was mentally retarded, characterizing him as mentally slow, but not the slowest sailor he had ever supervised.[211]

### 7. Dejulio Respers

Dejulio Respers met Williams when both were assigned to the Navy's correctional confinement unit ("CCU") in Japan.  The purpose of the CCU was to re-motivate sailors who were breaking rules or had substandard performance.[212]  Respers was assigned to the CCU after drinking alcohol and getting injured off the base.[213]  Sailors had to do regular military chores while in the CCU as well as other duties, such as picking up trash and painting the ship.[214]

Respers testified that Williams had trouble following instructions and often commented, "I don't understand it. You know,

---

[208]    EH, Vol. 5, p. 163.

[209]    EH, Vol. 5, p. 170.

[210]    EH, Vol. 5, p. 180.

[211]    EH, Vol. 5, p. 176.

[212]    EH, Vol. 2, p. 109.

[213]    Id.

[214]    EH, Vol. 2, p. 110.

I don't feel like it."[215]  After Respers showed Williams the correct way to do a job, Williams would question why the job had to be done that way.[216]  When Williams was unable to perform a job correctly after several explanations, Respers and the others took the path of least resistance and simply completed the task for him.[217]

Williams was required to write a letter to the Administrative Separation Board in support of his request that the board not discharge him from the Navy.  This was his letter:

> First of all my name is Seaman Jeffrey Demond Williams. I'm from Houston, TX.  In June of 1994 I graduated from Robert E. Lee High School.  Thought [sic] out of high school I was faced with an atmosphere of drugs, friends turning on each other over stupid things, deaths of [illegible] friends, some legitimate reasons, the rest, well I can't stay [sic] on paper.  These were the same people I used to play ball with, shoot pool with, now that's all gone.  That is when I finally decided to join the Navy, to better myself, and my mom.  I figured since I joined the Navy, I won't have to do the same things my deceased friends did, and went through.  For me the Navy is a stepping stone.  Once I finish in the Navy and go back to the world, jobs will be easy to clutch.  I've realized I've made some mistakes while on board U.S.S. Mobile Bay.  I really want to finish my time on board, so in September, I can take the (MS3) test, and hopefully pass it, and excel forward in the Navy, and in a different division.  Right now I'm in Deck Division, and that division honestly, isn't me.  I can't work anywhere when I'm not happy, and basically due to my Division Officer and OPS Officer, I feel that I work hard daily and my Division Officer and OPS doesn't see that.  Basically, I feel that I'm not getting a fair shake.  My LCPO, LPO, on down see and know I work hard and gets [sic] the job completed.  So I hope to God that if I don't get kicked out [sic] the Navy, I really want to take the (MS3) exam

---

[215]  Id.

[216]  EH, Vol. 2, p. 111.

[217]  Id.

early September.  I know I can pass it, and perform well
in S-2 Division.  I've been in First Division for almost
twenty months, and its [sic] time to move on.  I like
working for BM1, my LPO, BM' Moore, BM' Holland, the rest
of the BM2's and BM3's, but overall I really like working
with the seamen, but I can't speak to my Division Officer,
because I feel everytime [sic] I hold a conversation with
him there's tension.  See my Division Officer and OPS
Officer just don't realize if I get kicked out, I'll have
a very hard time getting a legitimate job back home.  I've
had a friend back home, he had a General Discharge and it
took him almost a year to get a good job.  That's why I
don't want to get kicked out.  Already I've served almost
two years on board U.S.S. Mobile Bay.  All I want is to
finish my time in the Navy, maybe if things go right, I
might reenlist for two or three more years, so I can buy
me a house and a car back in Houston, TX.  That's one of
my future goals while being in the Navy, but if I get
kicked out, I can't [entire line illegible - bad copy].
I've been into so much devilment while on board, and I
apolize [sic], but I'm sincere and I want I [sic] stay in
the Navy, so I can live the good life, not a life where
I'd have to hustle drugs, watching my back every other
day.  I don't want that. Nobody wants that. [Signature][218]

Respers initially testified that approximately ninety percent
of Williams' letter was Respers' work product.[219]  On cross-
examination, he conceded that he actually supplied the wording for
much less than that; the bulk of the letter was written by Williams,
with a few suggestions and corrections from Respers.

According Respers, he advised Williams to begin the second
sentence with "In June of 1994. . . ," rather than "In 1994, I
graduated. . ."[220]  The rest of the first part of the letter was

---

[218]    R. Ex. 3, pp. 54-56.  The court has attempted to copy Williams'
spelling and punctuation verbatim.  Respers stated that the letter is in
Petitioner's handwriting.  Id. at p. 116.

[219]    EH, Vol. 2, p. 118.

[220]    EH, Vol. 2, pp. 132, 160.

Williams' work product.[221]    Respers stated that the use of the
"stepping stone" analogy was his.[222]  Williams then wrote the portion
of the letter up to the mention of the U.S.S. Mobile Bay without
assistance.[223]   At that point, Williams asked Respers what else he
should include, and Respers advised Williams to discuss his goal of
becoming a Master Seaman 3.   Williams wrote about that goal in his
own words from "[H]opefully pass the MS3 test," until "I feel I'm
not getting a fair shake."[224]   Respers corrected Williams' spelling
of "Division,"[225] and "legitimate."[226]   Those were the only spelling
corrections made by Respers.[227]   Respers took credit for the "So I
hope to God..." sentence[228] and helped Williams with the "I want to
finish my time..." sentence, but conceded on cross-examination that
Williams wanted to express those ideas and Respers merely helped him
with the phrasing.[229]   Respers also took credit for the "I want to
stay in the Navy..." sentence, but agreed that it was Williams'
intention to express that thought.[230]   Respers testified that it was

---

[221]    EH, Vol. 2, p. 160.

[222]    EH, Vol. 2, pp. 135-36.

[223]    EH, Vol. 2, p. 140.

[224]    EH, Vol. 2, p. 142.

[225]    EH, Vol. 2, pp. 143-44.

[226]    EH, Vol. 2, p. 148.

[227]    EH, Vol. 2, p. 144.

[228]    EH, Vol. 2, pp. 144-45.

[229]    EH, Vol. 2, pp. 146, 161.

[230]    EH, Vol. 2, pp. 151, 161.

Williams' idea to use the words or phrases "sincere," "devilment," "hustle," and "nobody wants that."

Respers also testified that sailors in the CCU had workbooks and tests to complete.[231]  Respers did not assist Williams in completing those assignments and did not observe Williams seeking assistance from anyone else.[232]

  C. <u>Military Disciplinary Record</u>

The following is taken from Williams' military record:

On December 29, 1994, Williams received a written counseling for being away from his assigned work space.[233]  He was found eating a burrito in a break room.  He was reminded that he must check with a supervisor before leaving his work area and that he was not to eat his morning meal or visit the food truck or the ship's store during working hours unless specifically authorized by his supervisor.[234]

On December 31, 1994, Williams received a written counseling for failing to report for duty at 8:15 a.m.[235]

On June 5, 1995, Williams received a third counseling for having his "gear adrift," a Navy term for having a messy cubicle.[236] Williams had a top rack and his supervisor, petty officer Holland,

---

[231] EH, Vol. 2, p. 165.

[232] <u>Id.</u>

[233] R. Ex. 3, p. 26.

[234] <u>Id.</u>

[235] R. Ex. 3, p. 28.

[236] R. Ex. 3, p. 30.

bunked underneath Williams. Holland reprimanded Williams for dirtying Holland's sheets, for leaving trash on Holland's rack and allowing others to sit on Holland's rack.[237] Williams received Extra Military Instruction as a punishment.[238]

On June 11, 1995, Williams was counseled for excessive alcohol consumption after he was brought back to the ship and turned over to the master at arms.[239] Williams was taken to the hospital where he was found to have a blood alcohol level of .360.

On August 10, 1995, Williams was observed out of uniform by Commander Mahon.[240] After the officer stopped him and asked about his appearance, Williams responded, "Don't worry about it; it is none of your business," and continued walking.[241] When Mahon responded that it was his business, Williams "got in [his] face and asked who [he] thought he was."[242] Mahon instructed petty officer Moore to get Williams into a proper uniform.[243]

Following this incident, Williams received a Notice of Counseling for substandard performance and having a disrespectful

---

[237]    Id.

[238]    R. Ex. 3, p. 42.

[239]    R. Ex. 3, p. 31.  The date of the offense is found at R. Ex. 3, p. 134.

[240]    R. Ex. 3, p. 32.

[241]    Id.

[242]    Id.

[243]    EH, vol. 5, pp. 101-02.

and insubordinate attitude.[244] Examples cited were Williams' failure to show respect to the officer of the deck and the conning officer while on watch, Williams' refusal to address a commissioned officer as "Sir," and his refusal to answer specific questions in the same manner.[245] The counseling concluded that Williams had demonstrated his ability to perform his duties but his lackadaisical attitude toward standing watch had caused complaints about his ability to perform at a satisfactory level.[246]

On September 21, 1995, Williams was counseled for applying paint over a hatch surface that was not properly cleaned and/or de-rusted.[247] The notice instructed Williams on the proper sanding and painting protocol that must be followed.[248]

On September 24, 1995, Williams received a counseling for steering twelve degrees off course. The notice attributed this to not paying attention and also counseled him to improve his performance.[249] His helmsman qualifications were revoked.[250]

On September 27, 1995, Williams was counseled for having "slovenly habits," slouching during inspection, and lacking military

---

[244]  R. Ex. 3, p. 33.

[245]  Id.

[246]  Id.

[247]  R. Ex. 3, p. 36.

[248]  Id.

[249]  R. Ex. 3, p. 34.

[250]  Id.

bearing.[251]

On October 6, 1995, Williams received Extra Military Instruction for leaving his garment bag out after having his garment bag turned in on two previous occasions as gear adrift.[252]

On October 13, 1995, Williams appeared at a hearing before the Disciplinary Review Board for telling petty officer Holland to "shut up and turn around," and calling him a "f—ing bitch."[253]  Williams also stated that he did not like him, that he was going to shoot Holland, pointed a cap gun at him and fired it.[254]  When Holland verbally reprimanded Williams for this conduct Williams became irate and verbally abusive to Holland.[255]  On October 21, 1995, the commanding officer sent Williams to the CCU for thirty days based on the recommendation of the Disciplinary Review Board.[256]

Before he was sent to the CCU, Williams was counseled on October 17, 1995, for leaving his duty station without permission.[257] Williams had been reminded by an officer not to leave his area without first checking with the petty officer in charge.[258] After the officer left the area, Williams left the work area without

---

[251]    R. Ex. 3, p. 35.

[252]    R. Ex. 3, p. 58.

[253]    R. Ex. 3, p. 44.

[254]    R. Ex. 3, p. 57.

[255]    EH, Vol. 5, pp. 73–74.

[256]    R. Ex. 3, p. 45.

[257]    R. Ex. 3, p. 38.

[258]    Id.

permission.[259]

On November 21, 1995, Williams was counseled for his performance, personal behavior and work progress.[260]  The specifics are illegible.

On March 25, 1996, Williams appeared before the Disciplinary Review Board for an unauthorized absence from his place of duty.[261] He was placed on restriction and extra duty for fifteen days.  It was recommended that Williams be separated from military service.[262]

On May 15, 1996, Williams was counseled on a number of observed deficiencies in his performance.

On June 21 and 26, 1996, Williams was counseled about having his gear adrift on two separate occasions within days of each other.

On September 18, 1996, the Chief of Naval Personnel recommended that Williams be separated from the Navy based on his prior misconduct in October 1995, subsequent disciplinary issues and substandard performance.[263]  Williams received a general discharge from the Navy on October 30, 1996.[264]

Williams' Navy records contain character witness forms apparently filled out in connection with his disciplinary problems.

---

[259]    Id.

[260]    R. Ex. 3, p. 39.

[261]    R. Ex. 3, p. 47.

[262]    R. Ex. 3, p. 48.

[263]    R. Ex. 3, p. 105.

[264]    R. Ex. 3, p. 110.

The comments were uniformly positive: "a solid performer,"[265] "improving," "possesses leadership abilities but does not always lead in positive manner,"[266] "an extremely resourceful person,"[267] "steadily improving,"[268] "respectful,"[269] and "an average sailor."[270]

Williams received a citation for exemplary performance in November 1995.

### 4. Post-Military/Pre-Arrest

#### A. Dwalon Youngblood

In December 1996, Williams phoned Youngblood and told him that he was getting out of the Navy, that his family had moved and he could not locate them, and that he had no other family with whom he could stay.[271] Youngblood stated that he did not know where Williams was calling from but offered Williams a place to stay if he could get to Chicago.[272] Williams flew to Chicago several days later and called Youngblood.[273] Youngblood drove Williams back to Gary, Indiana, where Youngblood was renting a room from his aunt, Padrica

---

[265]    R. Ex. 3, p. 60.

[266]    R. Ex. 3, p. 63.

[267]    R. Ex. 3, p. 65.

[268]    R. Ex. 3, p. 67.

[269]    R. Ex. 3, pp. 60, 69, 70, 71, 72, 73, 77.

[270]    R. Ex. 3, p. 70.

[271]    EH, Vol. 2, p. 35.

[272]    Id.

[273]    EH, Vol. 2, pp. 35-36.

Youngblood.[274]  It was agreed that Williams would pay rent of seventy-five dollars per week to Ms. Youngblood once he obtained employment.[275]  Ms. Youngblood cooked the meals as part of the living arrangement.[276]

Youngblood was employed at the Trump casino boat and offered to help Williams apply for a job there.[277]  Youngblood testified that, as a precondition to employment, Williams had to obtain an Indiana driver's license.[278]  Williams failed the written test three times because he could not correctly identify road signs.[279]

Youngblood helped Williams fill out the application and other employment forms and Williams was hired at the Trump casino boat as a deck hand.[280]  Williams' duties included walking the deck to check for fire or other safety hazards, checking the fire extinguishers, making minor repairs and painting the boat.[281]  Youngblood testified that Williams adequately performed when he was on fire watch, but complained if he was asked to do anything else, such as boat maintenance.[282]  Youngblood stated that Williams could follow

---

[274]    EH, Vol. 2, pp. 34-35.

[275]    EH, Vol. 2, p. 93.

[276]    Id.

[277]    EH, Vol. 2, p. 38.

[278]    EH, Vol. 2, pp. 40-41.

[279]    Id.

[280]    EH, Vol. 2, pp. 46-47.

[281]    EH, Vol. 2, p. 49.

[282]    Id.

48

directions, but whether he would comply with the directions was another matter; if Williams had decided not to do a particular job, he would try his hardest not to do it.[283] Records from his employment confirm that Williams was repeatedly disciplined for poor job performance and calling in sick.[284]

As a condition of his employment, Williams had to become certified as an Inflatable Buoyant Apparatus Operator, which required passing an eight-hour safety course.[285] Williams passed the test without any help from Youngblood.[286]

While living in the same house, Youngblood never saw Williams cook.[287] Williams did not like to clean and getting him to clean the house was "like pulling teeth."[288] Williams wore his work uniform five to six days per week, and also wore his winter uniform coat during the summer.[289]

Eventually, Williams rented his own apartment and purchased a car without any help from Youngblood.[290] Youngblood advised Williams

---

[283]    EH, Vol. 2, p. 50.

[284]    Petitioner's Exhibits, ("Pet. Ex."), 22, 23, 24, 25, 26.

[285]    EH, Vol. 2, pp. 56-57.

[286]    EH, Vol. 2, p. 57.

[287]    EH, Vol. 2, p. 51.

[288]    Id.

[289]    EH, Vol. 2, pp. 52-53.

[290]    EH, Vol. 2, pp. 59, 94; Pet. Ex. 14 shows that in May 1997, Williams purchased a 1985 Buick LeSabre for $1,195, "as is," paid $350 down, and agreed to pay $100 every two weeks.  He made two payments before the car became disabled.  The dealer obtained a judgment for the unpaid balance.  Pet. Ex. 14.

to look for an apartment located close to the casino, but Williams chose one that was not close.[291]  Williams had an automobile accident and broke a tie rod.  He did not get the car repaired and eventually a wheel came off.[292]  Williams was fired from his job in July 1997,[293] and, as a result, he was unable to pay rent on the apartment.[294] During the short time he had the apartment, Williams had no furniture but slept on the carpet.[295]  After his termination, Williams made a claim for unemployment benefits.[296]

After Williams was evicted from his apartment, he stayed with another friend of Youngblood's, Willie Clay.[297]  It was during that time that a relative of Williams called the Youngblood residence looking for Williams.[298]  Youngblood testified that he was shocked to learn that Williams had not lost touch with his family and offended that Williams had lied to him.  Youngblood assisted Williams in getting a bus ticket back to Houston.[299]

### B.  James Jones

James Jones testified by videotaped deposition.  Jones lived

---

[291]    EH, Vol. 2, p. 58.

[292]    EH, Vol. 2, p. 65.

[293]    Pet. Ex. 28.

[294]    EH, Vol. 2, p. 58.

[295]    EH, Vol. 2, pp. 62-63.

[296]    Pet. Ex. 27.

[297]    EH, Vol. 2, p. 66.

[298]    Id.

[299]    EH, Vol. 2, p. 67.

with Padrica Youngblood during the time Williams rented a room from her.  He observed that Williams wore his work uniform almost twenty-four hours a day, including the uniform coat, regardless of the weather.[300]  He recalled that Ms. Youngblood insisted that Williams bathe on one occasion.[301]  Williams never cleaned the house or his sleeping area unless told to do so.[302]  Williams tried to cook once; the result was scorched pans and grease everywhere.[303]  Jones added that Williams once raked the leaves in front of the house at the request of Ms. Youngblood.[304]  After raking the leaves into a pile, Williams set fire to the pile, leaving a large area of burnt grass.[305]

### C.   Reginald Tolbert

Tolbert reconnected with Williams after his naval service. After losing a job at a grocery store, Williams moved in with Tolbert and Hazel Garcia.  According to Tolbert, Williams lost a job making deliveries because he could not read a map.[306]  Williams had owned a car when he first moved in with Tolbert, but the car became inoperable two or three months later because Williams did not put oil into the car.[307]

---

[300]   EH, Vol. 2, p. 179.

[301]   EH, Vol. 2, p. 180.

[302]   EH, Vol. 2, p. 181.

[303]   EH, Vol. 2, pp. 181-83.

[304]   EH, Vol. 2, pp. 183-84.

[305]   Id.

[306]   EH, Vol. 1, p. 217.

[307]   EH, Vol. 1, p. 216.

During the several months they lived together before his arrest, Williams was mostly unemployed and had little money. Williams was able to fill out basic information on job applications such as his name, date of birth, and work history.[308] However, Williams needed advice in answering open-ended questions such as why he wanted to work for that company.[309]

Williams tried to cook on one occasion and burned the food.[310] After that, he was not allowed to cook in the apartment.[311] Tolbert had to encourage Williams to eat with him and Garcia and attributed William's reluctance to eat to the fact that Williams did not have much money to contribute to buying groceries.[312] Tolbert testified that Williams did not change his clothes often, explaining that Williams only had two or three outfits that he alternated wearing.[313] Tolbert related that he never had to ask Williams to take a shower and that Williams never had a body odor.[314]

Tolbert related one incident when he and two others went into a Taco Cabana to eat while Williams waited in the car.[315] Williams

---

[308]    EH, Vol. 1, p. 227.

[309]    Id.

[310]    EH, Vol. 1, pp. 229, 271.

[311]    Id.

[312]    EH, Vol. 1, pp. 229-30, 262.

[313]    EH, Vol. 1, pp. 220, 257.

[314]    EH, Vol. 1, pp. 221, 257, 262.

[315]    EH, Vol. 1, p. 231.

did not join the others because he had no money.[316]   When they
returned, Williams was sitting in the car with the windows rolled up
and the car filled with cigar smoke.   When they knocked on the
window, Williams exited the car sweating and wearing only his boxer
shorts and a cap.[317]   Tolbert and Garcia found this humorous.
Williams had no explanation for his behavior other that it was
"hot."[318]   Tolbert denied the suggestion that the cigar had had
marijuana in it.[319]

Tolbert was aware that Williams was driving a stolen Lexus.[320]
He repeatedly advised Williams to get rid of the car, but Williams
ignored the advice.[321]   Williams referred to the car as his, washed
it, and bought compact discs to play while he drove it.   Williams
made no attempt to disguise the identity of the car.[322]

     D.   <u>Hazel Garcia</u>

Hazel Garcia ("Garcia") testified that Williams lived with her
and Tolbert for several months prior to the murder of Blando.[323]
Tolbert's brother paid the rent and utilities, the others paid for

---

[316]   <u>Id.</u>

[317]   <u>Id.</u>

[318]   EH, Vol. 1, p. 232.

[319]   <u>Id.</u>

[320]   This is the car Williams was driving on May 19, 1999, when Officer
Blando stopped him.

[321]   EH, Vol. 1, p. 273.

[322]   EH, Vol. 1, p. 235.

[323]   EH, Vol. 5, p. 44.

their food and personal expenses.[324]  Garcia had a job, working from
10:00 a.m. to 7:00 p.m.  Tolbert and Williams were, for the most
part, unemployed during that time.[325]  Garcia testified that both
Tolbert and Williams smoked marijuana, refusing to estimate the
frequency.[326]  Williams' nickname among his friends was "Smoke."
During the time he lived with Garcia and Tolbert, Williams had few
clothes but washed them himself in the washer/dryer in the
apartment.[327]  Because she considered Williams a guest, Garcia did
not expect him to either cook or clean up around the house.[328]
Williams did not always eat the food Garcia left for him but would
buy food several times a week, usually Vanilla Wafers.[329]  Garcia also
noted that Williams owned a car but did not heed the oil warning
light and the car became inoperable.[330]

Garcia testified that Williams would believe anything and
described him as gullible.[331]  She also described Williams as
"slow."[332]

E.   Devin Wilburn

---

[324]    EH, Vol. 5, p. 45.

[325]    EH, Vol. 5, p. 45.

[326]    EH, Vol. 5, pp. 62-64.

[327]    EH, Vol. 5, p. 47.

[328]    EH, Vol. 5, p. 49.  Tolbert did not cook or clean up either.

[329]    EH, Vol. 5, p. 50.

[330]    EH, Vol. 5, pp. 54-55.  He also ran out of gas once.  Id.

[331]    EH, Vol. 5, p. 57.

[332]    EH, Vol. 5, pp. 57-58.

Wilburn reconnected with Williams after he returned from living in Indiana and saw him often.[333]  Wilburn related that sometimes Williams would stay at his apartment for three or four days and wore the same clothes every day.[334]  Wilburn would have to remind him to take a shower.[335]  Wilburn also observed that Williams wore a coat or a sweatshirt with a hood in the summer and, when asked about it, would laugh off the observation.[336]  Based on this conduct, Wilburn concluded that Williams was mentally retarded or mentally ill, which he conceded were the same thing to him.[337]  Wilburn also conceded that Williams was not the only one of the group who had had behavior problems in high school; Wilburn admitted that he had been expelled from school for fighting and that another mutual friend, Gregory Pierce, had been expelled for conduct reasons.[338]

    5.  Prison

        A.  Christopher Coleman

Christopher Coleman ("Coleman"), a fellow death row inmate, testified that he has lived near Williams over the past several years, sometimes living as close as four cells away, and at other

---

[333]  Id.

[334]  EH, Vol. 1, p. 288.

[335]  Id.

[336]  EH, Vol. 1, pp. 289, 302, 308.

[337]  EH, Vol. 1, p. 303.

[338]  EH, Vol. 1, p. 307.

times in different pods.[339]  He testified that he has given Williams
books to read on eastern religions and philosophies, but that in his
opinion, Williams had reading comprehension difficulties.[340]  Coleman
speculated that, while Williams was able to memorize some things, he
did not fully understand all that was being discussed.[341]  Williams
subscribed to several magazines at Coleman's request and for
Coleman's benefit because Williams had pen pals who would order and
pay for the magazines.[342]  Coleman also testified that on occasion he
helped Williams with letters to pen pals.  Coleman claimed that he
would write the letter and Williams would copy it in his own
handwriting.[343]  Coleman also testified that he wrote commissary
orders that Williams copied.  There was no explanation why Williams'
commissary orders had to be in his own handwriting.

        B.  Roy Pippin

    Roy Pippin ("Pippin"), a fellow death row inmate, testified
that he, too, helped Williams with his correspondence.[344]  According
to Pippin, Williams' penmanship was "fine," but Williams would spell
or use words incorrectly.[345]  In 2002, following the issuance of the

---

[339]    EH, Vol. 2, pp. 263, 289.

[340]    EH, Vol. 2, pp. 269-71.

[341]    EH, Vol. 2, p. 271.

[342]    EH, Vol. 2, pp. 271-73.

[343]    EH, Vol. 2, p. 277.

[344]    EH, Vol. 2, p. 307.

[345]    EH, Vol. 2, p. 308.

Atkins decision by the U. S. Supreme Court, Pippin contacted Williams and several other men to inquire if their attorneys intended to raise Atkins claims in pending motions for habeas corpus relief.[346]  According to Pippin, Williams did not know what Pippin was talking about so Pippin wrote a letter for Williams to sign requesting that his attorney raise an Atkins claim.  When asked why Pippin believed that Williams should ask his attorney to raise an Atkins claim, Pippin stated that Williams was a "recluse," did not make friends easily, and "just seemed like he fit the mold of what [Pippen had] read about the Atkins case."[347]  Pippin characterized Williams as "kind of lost," concluding, "I'm not saying retarded or dumb."[348]

    C.  <u>Jerrie Smith</u>

Jerrie Smith is a licensed professional counselor and earned her bachelor's and master's degrees in psychology from Emporia State University.  She worked for the Texas Department of Criminal Justice ("TDCJ") as a staff psychologist from 1999-2004.  In that position, Smith administered the TONI-3, a test of nonverbal intelligence, to Williams upon his arrival on death row.[349]  Williams scored in the thirteenth percentile, indicating a nonverbal IQ of 83.  This score

---

[346]  <u>Id.</u>

[347]  EH, Vol. 2, p. 309.

[348]  <u>Id.</u>

[349]  EH, Vol. 4, p. 206.

was too high to qualify for a place on her mental health case load.[350] Smith testified that this score notwithstanding, if TDCJ personnel believed that Williams was possibly mentally retarded, her unit would have been notified and Williams would have been reevaluated.[351] Williams was never referred for a reevaluation.[352]

### D.    Melodye Nelson

Melodye Nelson is a Major of Correctional Officers for TDCJ. She serves at the Polunsky Unit, which houses death row inmates, including Williams.[353] Contradicting in part the testimony of Pippin and Coleman, Nelson testified that Williams had very limited means to verbally communicate with other inmates, have letters drafted by other inmates, or obtain legal advice from "jailhouse lawyers." Inmates on death row are confined to their cells twenty-two hours per day.[354] Communication between pods was physically impossible.[355] Inmates housed in the same pod had no physical contact but could yell at each other through a three-inch slot in their cell doors.[356] Consequently, the pods where the inmates were housed were very

---

[350]    EH, Vol. 4, p. 209.

[351]    EH, Vol. 4. p. 213.

[352]    Id.

[353]    Evidentiary Hearing Transcript, May 22, 2006, Docket Entry No. 148, ("EH2"), p. 3.

[354]    EH2, p. 12.

[355]    EH2, pp. 12, 32.

[356]    EH2, pp. 3, 20.

loud.[357]  Nelson also stated that it was possible for inmates in close proximity in a pod to communicate by sliding books or documents on the floor and using an improvised string to pull the item through the cell's door slot.[358]  This activity was prohibited by TDCJ policy and, if seen by a correctional officer, the inmate and his cell were subject to search and the communication confiscated.[359]  Inmates were strip-searched going to and from the day room and/or recreation area, making it unlikely that letters could have been passed between Williams and other inmates.[360]  Writing materials were not permitted in the recreation area.[361]  TDCJ records do not reflect that Williams ever requested a face-to-face legal visit with either Pippin or Coleman.[362]

E.   Rosa Moss

Rosa Moss is a correctional officer at the Polunsky Unit.  On March 31, 2006, Moss distributed a letter to Williams at his cell.[363] Williams called her back and told her she had given him the wrong letter and handed her back a letter addressed to Coleman.  When Moss saw the letter, it was obvious to her that it was not the letter she

---

[357]   Id.

[358]   EH2, pp. 3, 20-21.

[359]   Id.

[360]   EH2, pp. 32, 36-37.

[361]   EH2, p. 37.

[362]   EH2, p. 36.

[363]   EH2, p. 78.

had handed Williams and it had not been through the TDCJ mail room.[364] Direct communication between inmates is prohibited by TDCJ, so Moss confiscated and opened the letter.[365]　The letter, dated March 28, 2006, and addressed to inmate Coleman, identified, by name, several TDCJ employees as "fools" who were on Respondent's witness list in Williams' evidentiary hearing.[366]　Williams signed the letter "Selassie."　The letter, while not a direct threat, made Moss uneasy.[367]

Moss also testified that Williams washed his clothes in his sink and occasionally cleaned his cell.[368]　Based on her personal interactions, she believed that Williams was of normal intelligence.[369]

### 6. Expert Testimony

Dr. Gilda Kessner is a licensed psychologist with an expertise in psychological testing.　Dr. Kessner administered the Mini Mental State Examination[370] to determine Williams' functionality and

---

[364]　EH2, p. 80.

[365]　Id.

[366]　R. Ex. 16.

[367]　EH2, pp. 91-94.

[368]　EH2, p. 85.

[369]　EH2, pp. 85-86.

[370]　This test determines if the subject is correctly oriented to date, season, time, place, details of his surroundings, and other basic information. It measures concentration by asking the subject to subtract a certain number in a serial manner. Out of a maximum thirty points, Williams received twenty-eight; in subtracting seven from one hundred in a serial fashion, Williams made two math errors. EH, Vol. 3, p. 69.

concentration and the REY 15[371] to evaluate Williams' effort in taking the tests.  Based on his performance on those tests, Dr. Kessner believed that Williams was making an adequate effort on the tests and was not malingering.[372]

Dr. Kessner administered the Wechsler Adult Intelligence Scale, Third Edition ("WAIS"), a comprehensive intelligence test, considered by most experts to be the "gold standard" of intelligence tests.  Williams received a 70 on the verbal portion of the test, The 95% confidence interval for that score was 68 to 76, meaning that there was a 95% confidence level that Williams' Verbal IQ was in the range of 68 to 76.  Williams' Performance IQ score was a 77; the 95% confidence interval for that score was 72 to 85.  The full scale IQ was 70;[373] the 95% confidence interval on the full scale score was 66 to 76.

Dr. Kessner also administered the Wide Range Achievement Test - Revision 3 ("WRAT-3").[374]  Williams scored a 79 in reading, a level equivalent of seventh grade.  His score in spelling was a 69, or fourth grade equivalent, and his arithmetic score was a 70, again a fourth grade equivalent.  Williams' scores on the Kaufman Functional

---

[371]    The REY 15 shows the subject fifteen items, five sets containing three items each, for ten seconds.  The items are removed and the subject must write down the items that he saw.  Williams correctly remembered three complete sets and missed one each in two sets.  EH, Vol. 3, pp. 70-71.

[372]    EH, Vol. 3, p. 71.

[373]    The full scale IQ is determined by a chart attached to the test; it is not an average of the verbal and performance scores.  EH, Vol. 3, p. 79.

[374]    The WRAT-3 was described by Dr. Kessner as a brief test of basic academic skills.  Pet. Ex. 36, Expert Report, p. 3.

Academic Skills Test (K-FAST")[375] were higher; he received a 78 in arithmetic [95% confidence interval was 69 to 89], an 82 in reading [95% confidence interval was 73 to 93], and a composite score of 79 [95% confidence interval was 72 to 87].

The AAMR set the diagnostic criterion for a diagnosis of mental retardation at 70;[376] however, factoring in the standard margin of error that favored a positive diagnosis of mental retardation, the AAMR allowed for a diagnosis of mental retardation with a score of 75. Dr. Kessner testified that, in her opinion, even a person with a Full Scale IQ score of 78 could satisfy the first prong of the AAMR test.

Dr. Kessner had no credible explanation how Williams could perform at a non-mentally retarded academic level on the K-FAST, the Metropolitan Achievement Test, 6th Revision ("MAT-6"), the Woodcock-Johnson test and other achievement tests, when she had described the verbal portion of the WAIS as measuring "information you learn in school and things that you have learned from education or training; vocabulary information, comprehension."[377]

When pressed to reconcile the achievement scores with the lower IQ scores, Dr. Kessner explained that Williams' higher achievement

---

[375]   The Kaufman or "K-FAST" was described by Dr. Kessner as a simple-to-administer test of the application of reading and arithmetic skills in an everyday, real world setting. Pet. Ex. 36, Expert Report, p. 3. It is normed to an average score of 100. EH, Vol. 3, p. 149.

[376]   A score of 70 is two standard deviations from the average IQ score of 100, hence its numerical significance.

[377]   EH, Vol. 3, p. 73.

test scores were not inconsistent with his IQ scores because the
confidence intervals overlapped, albeit at the top end of the
confidence interval range for IQ, and the low end of the confidence
level for the achievement tests.[378]  This testimony glossed over the
fact that the scores overlapped outside of the mentally retarded
range.  Dr. Kessner found that the Full Scale IQ score of 70
satisfied criterion A of "significantly subaverage general
intellectual functioning" for diagnosis of mental retardation as
defined by the DSM-IV.  Dr. Kessner offered no opinion on the
presence of any adaptive deficits.[379]

Dr. Richard Garnett also testified as an expert witness for
Williams.  Dr. Garnett is a former member of the board of directors
of the AAMR and has held positions with numerous other organizations
concerned with people with developmental disorders.[380]  He holds a
Ph.D. in psychology, but is not a licensed psychologist.  He is a
licensed professional counselor, licensed chemical dependency
counselor, and licensed marriage and family therapist.  He testified
that his licenses allow him to diagnose mental retardation.[381]  In his
opinion, most licensed psychologists are not qualified to diagnose
mental retardation because they lack significant clinical experience

---

[378]    For example, the confidence interval on Williams' Verbal IQ score was
68 to 76.  The confidence interval on Williams' Full Scale IQ was 66 to 76.  He
scored a 79 in reading on the WRAT, and had a composite score of 79 on the K-
Fast, with a confidence interval of 72 to 87.

[379]    EH, Vol. 3, p. 139.

[380]    EH, Vol. 4, pp. 59-62.

[381]    EH, Vol. 4, p. 59.

with the mentally retarded.[382]  He is a frequent expert witness in this area, having been retained to evaluate over twenty-five inmates making <u>Atkins</u> claims.  He testified that he rejected participation in five or six cases after his initial look at records indicated no retardation; in the rest he has offered testimony that the client is mentally retarded.[383]

Dr. Garnett explained that IQ testing is the best way to measure intelligence because IQ tests are designed to measure all of the diffuse elements of intelligence.[384]  In contrast, academic achievement tests measure a narrower portion of intelligence.  Dr. Garnett analogized assessing intelligence based on an achievement test to diagnosing cancer based on the patient's temperature.[385]

Dr. Garnett assessed Williams' letter to the Separation Review Board as written at the seventh-grade level, using the Flesch-Kincaid Grade Level test.[386]  Explaining that this level was not inconsistent with a diagnosis of mental retardation, Garnett stated that persons with mild mental retardation can achieve at a sixth- or seventh-grade level and, in some cases, at an eighth- or ninth-grade level in specific areas.[387]  He offered no studies to support this

---

[382]    EH, Vol. 4, p. 64.

[383]    EH, Vol. 4, pp. 132-33.

[384]    EH, Vol. 4, pp. 69, 84.

[385]    EH, Vol. 4, p. 84.  This analogy ignores the high correlation between achievement test scores and IQ and is not particularly persuasive.

[386]    EH, Vol. 4, p. 123; R. Ex. 3, pp. 54-56.

[387]    EH, Vol. 4, p. 124.

testimony.

Dr. Garnett also testified that mentally retarded people often manage to function well in everyday life and adopt strategies to mask their deficiencies, such as finding other people who can help them.[388] Garnett found that Williams had such caretakers at home, in the Navy and in Gary, Indiana, a factor which confirmed his conclusion that Williams was mentally retarded.[389]

Addressing the AAMR's eleven specific areas of adaptive functioning,[390] Dr. Garnett opined that Williams showed significant deficits in the areas of self care, home living, social and personal skills, work, and leisure. He cited the testimony of friends that Williams did not dress appropriately, lost his apartment and failed to repair his cars.[391] Dr. Garnett believed Williams had deficits in his social personal skills because he had problems interacting with others[392] and adaptive deficits in his work life because he was not responsible, lacked respect, failed to follow through on chores and was fired from several jobs.[393] Williams had a functioning deficit in leisure based on the testimony of friends that he could not play

---

[388]    EH, Vol. 4, pp. 95-96.

[389]    EH, Vol. 4, p. 114.

[390]    The AAMR identifies these eleven areas of adaptive functioning: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. The Red Book (9th ed. 1992).

[391]    EH, Vol. 4, p. 104.

[392]    EH, Vol. 4, p. 105.

[393]    EH, Vol. 4, p. 107.

basketball or video games, and had no other hobbies.[394]  According to Dr. Garnett, from a diagnostic standpoint, the AAMR standard is a deficits model only; a person's strengths are ignored in making a diagnosis.[395]

Addressing the DSM-IV's three specific areas of adaptive functioning, Dr. Garnett opined that Williams showed significant deficits in the area of social functioning and daily living.[396]

Dr. Garnett rejected Dr. Allen's diagnosis of antisocial personality disorder based on testimony that Williams was emphathetic and joked with friends.  Dr. Garnett also rejected a diagnosis of ADHD because Williams could focus at times.[397]  He conceded that many of the traits he diagnosed as adaptive deficits were consistent with ADHD, conduct disorder, oppositional defiance, and learning disabilities.[398]  He concluded that Williams is mentally retarded under both AAMR and DSM-IV criteria.

Dr. Thomas Allen, a psychologist, testified as an expert witness for the Respondent.  Allen administered the Stanford Binet - 5 Intelligence Test; Williams scored a Verbal IQ of 75, Non-Verbal IQ of 70 and a Full Scale IQ of 71.  Allen used Green's Word Memory Test ("GWMT") to assess Williams' effort on the IQ testing.  He

---

[394]    EH, Vol. 4, p. 108.

[395]    EH, Vol. 4, p. 109.

[396]    EH, Vol. 4, p. 111.

[397]    EH, Vol. 4, p. 120.

[398]    EH, Vol. 4, pp. 118-20.

explained that effort is a very significant factor in test score variations, and that recent studies using tests such as GWMT have shown that the clinical judgments previously relied on by psychologists to assess effort were not very accurate.[399]

Allen concluded that Williams is not mentally retarded.[400] Based on Williams' score on the GWMT, Allen believed Williams did not put in good effort on the IQ testing conducted in connection with this litigation.[401] He based this conclusion on the fact that Williams scored a 42.5 on immediate recall, a score significantly below the cut-off score for poor effort of 82.5. Allen testified that this score was below the score he would be expect Williams to achieve by random chance, that is, if Williams were merely guessing.[402] Williams' score on delayed recall was 12.5, a score so low, in Allen's opinion, as to indicate an intent to deliberately give the wrong answers.[403] In fact, Williams' failing score was worse than the failing scores of a group of advanced dementia patients, aged 78, who were hospitalized because of dementia and worse than individuals diagnosed with major depression who also failed the test.[404] Notably, while Williams failed the GWMT, groups of mentally retarded adults

---

[399]    EH2, pp. 165-68.

[400]    EH2, p. 172.

[401]    EH2, p. 175.

[402]    See EH2, pp. 215-226. The GWMT provides a means to compare the test-taker's score to other patient groups.

[403]    EH2, p. 218.

[404]    EH2, p. 219.

and children passed it.[405]   Other studies have shown that the malingering rate among the prison population taking the GWMT is between sixty and seventy percent.[406]

Allen also testified that academic performance is highly correlated with IQ, and concluded that Williams' high school IQ score of 70 was inconsistent with his achievement test scores and his accomplishments in high school and afterward.[407] He accounted for Williams' three IQ scores at or near 70 as the result of poor effort on all three tests.

On cross-examination, it was suggested to Allen that it would take a lot of lucky guesses by Williams to figure out where to stop trying so as to appear mentally retarded, but not score so low that the score would be invalid on its face.   Dr. Allen responded, however, that it is possible to aim for a score in the mildly mentally retarded range without targeting a specific score, and that variances in Williams' verbal and performance IQ scores over the course of his three IQ tests, in which he scored higher on the verbal portion in two, and lower on the verbal portion in another, lend further credence to the conclusion that Williams was putting

---

[405]   EH2, p. 220.

[406]   EH2, p. 170.

[407]   EH2, p. 180. Allen found that Williams' letter to the separation board was consistent with someone who graduated from high school.  EH2, p. 209.  Allen also noted that Williams' reading material in prison supported his conclusion that Williams is not retarded.  The reading material included books by Jack Kerouac, Carlton Hume, Ayn Rand, Albert Ellis, and Aldous Huxley.  Id. at p. 188.

forth a poor effort.[408]

Allen attributed Williams' odd behaviors to a conduct disorder in adolescence and an anti-social personality disorder in adulthood.[409] These disorders manifested in Williams' cruelty to animals and vandalism as an adolescent and his later problems with authority figures and lack of remorse as an adult.[410] Allen found no deficits in daily living skills and rejected Williams' failure to clean his room as a teenager as evidence of an adaptive deficit.[411] Allen discounted the testimony that Williams could not follow rules of a game as evidence of an adaptive social deficit; rather, it confirmed that he had aspects of anti-sociality.[412] Allen viewed Williams as having impulse and anger issues but again found those problems as symptomatic of his anti-social personality disorder rather than mental retardation.[413]

Allen also disagreed with the deficits model used by Dr. Garnett, stating that the model is tainted by confirmation bias;

---

[408]    Evidentiary Hearing Transcript, May 23, 2006, Docket Entry No. 149, ("EH3"), p. 57. In sum, Williams' IQ test scores (confidence intervals) were:

|          | Verbal    | Non-Verbal | Full Scale |
|----------|-----------|------------|------------|
| HISD     | 79        | 65         | 70         |
| Kessner  | 70(68-76) | 77(72-85)  | 70(66-76)  |
| Allen    | 75(70-82) | 70(66-78)  | 71(68-76)  |

[409]    EH2, pp. 192-96.

[410]    EH2, pp. 195, 197.

[411]    EH2, p. 202. Allen noted that the testimony was that Williams was able to keep himself and his cell clean as an adult. _Id._

[412]    EH2, p. 203.

[413]    EH2, pp. 203-04.

that is, it looks for evidence supporting a presupposition of retardation while ignoring evidence to the contrary.[414]

### IV. __Analysis__

As discussed above, Williams has the burden of showing that he has: (1) significantly subaverage intellectual functioning; (2) related limitations in adaptive skill areas; and (3) the onset of those limitations before age 18.   Williams must meet all three elements to show that his execution would violate the Constitution. See Clark, 457 F.3d at 444.

### 1.   Significantly Subaverage Intellectual Functioning

The AAMR defines significantly subaverage intellectual functioning as "an IQ of about 70 or below (approximately 2 standard deviations below the mean)."  Briseno, 135 S.W.3d at 7 n.24.   It is undisputed that Williams scored a Full Scare IQ of 70 or 71 on three separate tests.   The expert testimony differed, however, on whether those scores are valid indicators of Williams' actual intellectual functioning.   Williams' experts testified that they are valid because it would be impossible for Williams to consistently achieve such similar scores if he were truly malingering.   Respondent's expert disagreed, noting Williams' higher academic achievement and evidence that Williams may have malingered on the tests.

Respondent's interpretation of Williams' intellectual functioning is the more plausible one.   While those three scores appear superficially to show a consistent subaverage intellectual

---

[414]   EH2, pp. 206-08.

functioning over time, a closer examination reveals that Williams was capable of scoring a Verbal IQ of 79 and a Performance IQ of 77, well outside the mentally retarded range.

This conclusion is further supported by Williams' performance on the GWMT used by Dr. Allen to assess Williams' effort. As Dr. Allen testified, Williams scored lower than one would expect if he was randomly guessing, below two groups of mentally retarded individuals and below Alzheimer's patients. His score strongly suggests that Williams knew at least some of the correct answers and deliberately answered incorrectly. This raises serious doubts about Williams' effort on the IQ tests as well, especially in light of a post-<u>Atkins</u> motivation to score in the mentally retarded range.

Williams' performance on academic achievement tests taken in middle-school, high-school, and as an adult are uniformly inconsistent with his purported IQ. Dr. Kessner was unable to provide any credible explanation for this deviation, other than the confidence intervals overlapped, albeit outside of the mentally retarded range. The court finds Dr. Allen's testimony that IQ and academic achievement are highly correlated more credible.

Moreover, Williams took classes at the twelfth-grade level, earned an 80 and 89 in two semesters of Chemistry, graduated with a C average and had a class rank of 326 out of 480. Most of the accommodations made for Williams in high school were directed toward behavioral, rather than intellectual, problems. Following these changes in Williams' classroom structure and curriculum, Williams'

71

grades improved and varied from slightly below average level to above average. This strongly suggests that any academic problems Williams experienced were caused by conditions other than mental retardation.[415] Notably, there is no question that Williams earned these grades without the assistance of others.

Williams' writing is not consistent with a finding of mental retardation. The court will not speculate that Coleman may be responsible for correspondence attributed to Williams and admitted into evidence. Coleman did not authenticate any particular letter as his work and, in light of his demeanor while testifying, his capital conviction, and the testimony from Major Nelson concerning how difficult such an authorship would have been to achieve, the court does not assign Coleman's testimony much weight. Similarly, Respers was sufficiently impeached on cross examination that the court is confident that Williams was responsible for a large percentage of the letter written to the administrative separation board, a letter that was not written at a mentally retarded level.

Williams' expert explains these discrepancies by stating that mentally retarded people have strengths as well as weaknesses. While this is undoubtedly true, Williams' strengths are simply too strong to support the conclusion that he has an IQ of 70 or below, or is otherwise significantly subaverage in intellectual functioning. Moreover, the Fifth Circuit has held that <u>Atkins</u> does

---

[415]    For example, a majority of his friends testified that Williams used alcohol, marijuana and fry during high school.

not require the states to apply the low end of the confidence
interval of IQ scores in determining whether a defendant is of
subaverage intellectual functioning.  <u>Clark</u>, 457 F.3d at 445-46.

These questions about the validity of his IQ test scores
combined with the other evidence of higher intellectual functioning,
such as the opinion of many of the Navy witnesses that Williams was
capable of performing his jobs in the Navy and not mentally
retarded, lead to the conclusion that Williams has an IQ
substantially higher than 70.  As the Fifth Circuit observed:

> The Texas Court of Criminal Appeals held when
> adopting its tests for mental retardation that
> scores gathered through intelligence testing are
> necessarily imprecise and must be interpreted
> flexibly.  <u>Briseno</u>, 135 S.W.3d at 7 n. 24.  The
> testing error, coupled with the differences
> between various IQ tests, mean that in many
> cases an individual who tests as having an IQ
> above 70, the rough cut-off for mental
> retardation, may still be diagnosed as mentally
> retarded, and vice versa.  *Id.*  Under this
> approach, courts should not rigidly consider an
> IQ score to be determinative of the defendant's
> intellectual functioning.

<u>Clark</u>, 457 F.3d at 444-45.   Considering Williams' borderline IQ
scores in light of his academic performance, other evidence of an IQ
above the mentally retarded range, and testimony of numerous
witnesses who did not believe that he was mentally retarded,
Williams, at a minimum, fails to carry his burden of proving that
his IQ is at least two standard deviations below the mean.

### 2.   <u>Significant Adaptive Limitations</u>

While the failure to show a valid IQ score below 70 is fatal to

Williams' claim, this court will consider the remaining mental retardation factors out of an abundance of caution. The AAMR definition of mental retardation also requires a showing of significant limitations in at least two "applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, and work." Atkins, 536 U.S. at 309 n.3. Texas' PMRA similarly requires a showing of "deficits in adaptive behavior," defined as "the effectiveness or degree to which a person meets the standards of personal independence and social responsibility expected of the person's age and cultural group." Tex. Health & Safety Code Ann. § 591.003(1).

Dr. Garnett opined that Williams showed significant limitations in the areas of self care, home living, social and personal skills, work, and leisure. He based these conclusions on reports of Williams not bathing unless told to do so when he was an adolescent, his habit of dressing in ways inappropriate to the weather, his becoming homeless after losing a job, his being beaten up as a child, quirks in his interactions with friends, his difficulty holding a job, and his inability to play games and sports. On cross examination, however, Garnett admitted that these deficits could also be explained by other diagnoses, including ADHD, conduct disorder, oppositional defiance, and learning disabilities.[416] Dr. Allen attributed any adaptive functioning deficits to anti-social

---

[416]    EH, Vol. 4, pp. 142-43.

personality rather than mental retardation.

This court finds Dr. Allen's explanation of Williams' deficits more credible. Williams was able to rent an apartment in Gary, Indiana, and buy at least two vehicles, one in Indiana and one in Houston, without any assistance. He was able to wash his clothes. Dr. Garnett noted that several witnesses testified that Williams did not bathe regularly unless told to do so. No witness testified, however, that Williams had body odor or appeared otherwise unclean. It therefore appears that Williams was able to care for his own hygiene, even if he bathed less often, or less noticeably, than other people. Similarly, while several witnesses noted Williams' various odd behaviors, there was also testimony that Williams could conform his conduct to expected social norms when he wanted to. Williams' eccentric behaviors are just as easily seen as attention-getting behaviors as they are evidence of mental retardation. To the extent that some behaviors could be considered to be adaptive deficits, they are not significantly so. Williams bears the burden of proof and he has not carried his burden of demonstrating that he has significant deficits in at least two areas of adaptive functioning.

### 3. Onset Before Age 18

Williams' performance in high school does not support a finding of significantly subaverage intellectual functioning before the age of 18.

## V. Conclusion

For the foregoing reasons, it is recommended that Respondent's Motion For Summary Judgment be **GRANTED** and that Williams' Petition For Writ Of Habeas Corpus be **DENIED**.

## VI.  Certificate Of Appealability

Williams has not requested a certificate of appealability ("COA"), but this Court may determine whether he is entitled to this relief in light of the foregoing rulings. See Alexander v. Johnson, 211 F.3d 895, 898 (5th Cir. 2000). There, the court stated, "It is perfectly lawful for district court's [sic] to deny a COA sua sponte. The statute does not require that a petitioner move for a COA; it merely states that an appeal may not be taken without a certificate of appealability having been issued." A petitioner may obtain a COA either from the district court or an appellate court, but an appellate court will not consider a petitioner's request for COA until the district court has denied such a request. See Whitehead v. Johnson, 157 F.3d 384, 388 (5th Cir. 1988); see also Hill v. Johnson, 114 F.3d 78, 82 (5th Cir. 1997) ("[T]he district court should continue to review COA requests before the court of appeals does"). "A plain reading of the AEDPA compels the conclusion that COAs are granted on an issue-by-issue basis, thereby limiting appellate review to those issues alone." Lackey v. Johnson, 116 F.3d 149, 151 (5th Cir. 1997).

A COA may issue only if the petitioner has made a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); see also United States v. Kimler, 150 F.3d 429, 431 (5th

Cir. 1998). A petitioner "makes a substantial showing when he demonstrates that his application involves issues that are debatable among jurists of reason, that another court could resolve the issues differently, or that the issues are suitable enough to deserve encouragement to proceed further." Hernandez v. Johnson, 213 F.3d 243, 248 (5th Cir. 2000). The Supreme Court has stated that:

> Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.

Slack v. McDaniel, 529 U.S. 473, 484 (2000). "The nature of the penalty in a capital case is a 'proper consideration in determining whether to issue a [COA], but the severity of the penalty does not in itself suffice to warrant the automatic issuing of a certificate.'" Washington v. Johnson, 90 F.3d 945, 949 (5th Cir. 1996) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 (1983)).

This is a close case. On the facts of this case, reasonable jurists can disagree about whether the evidence supports Williams' claim that he is mentally retarded. Therefore, it is **RECOMMENDED** that a COA be granted on this issue.

## NOTICE TO PARTIES

A party's failure to file written objections to the proposed findings, conclusion, and recommendation in a magistrate judge's report and recommendation within ten (10) days after being served with a copy shall bar that party, except upon the grounds of plain

error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusion accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. <u>See</u> <u>Douglass v. U. S. Auto. Ass'n</u>, 79 F.3d 1415 (5th Cir. 1996).

SIGNED this 8th day of January, 2007, in Houston, Texas.


Nancy K. Johnson
United States Magistrate Judge