IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JEFFREY DEMOND WILLIAMS, | : | |
| Petitioner, | : | |
| v. | : | Civil No. H-04-2945 |
| | : | |
| NATHANIEL QUARTERMAN, | : | |
| Director TDCJ-CID, | : | |
| Respondent. | : | |

## WILLIAMS' OBJECTIONS TO JANUARY 8, 2007, PROPOSED FINDINGS, CONCLUSION AND RECOMMENDATION

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

Petition Jeffrey Williams, an indigent inmate on Texas' death row, timely filed a petition for a Writ of Habeas Corpus on July 20, 2004. DE #18. On July 15, 2005, this Court entered an order granting Williams a hearing on his *Atkins* claim, DE #39, and referring this case to the Honorable Nancy K. Johnson, United States Magistrate Judge. DE #44. Magistrate Johnson held a seven-day hearing April 17-21, 2006, and May 22-23, 2006, on Williams' *Atkins* claim. On August 14, 2006, Williams and the Director filed post-hearing briefs. DE #152 & 153. On January 8, 2007, Magistrate Johnson entered her "Memorandum and Recommendations" recommending denial of Williams' habeas petition. DE #161. The Court granted Williams a 10-day extension to file objections. DE #163. Petitioner Jeffrey Williams, by counsel, objects to the proposed findings, conclusion and recommendation of United States Magistrate Judge Johnson in her order of January 8, 2007.

### I. The State's Expert, Dr. Thomas Allen, was Unqualified to give an opinion on whether Williams is Mentally Retarded.

The State's expert, Dr. Thomas Allen, 5/22/2006 T. 122,[1] was not qualified under *Daubert* or Rule 702 to render an opinion whether Jeffrey Williams is mentally retarded. Allen's primary area of practice is forensic psychology. 5/22/2006 T. 137. He has virtually no professional experience with the mentally retarded. T. 140-46. He is not a member of the AAMR (American Association of Mental Retardation), the Texas AMR (Texas Association on Mental Retardation), or the ARC (National Association for Retarded Children). T. 146. He has virtually no personal experience through his work or outside of work with people who are mentally retarded. T. 147. Allen doesn't stay current with MR literature. T. 149. Allen has not even heard of the Texas case that sets the standard for determining whether a defendant is mentally retarded, *Ex parte Briseño*, 135 S.W.3d 1 (Tex. Crim. App. 2004). T. 150. Allen does not own a copy and has not even read the book that elaborates on the definition cited in *Briseño* and *Atkins*, the AAMR's "Mental Retardation: Definition, Classification and Systems of Supports, 2002." T. 150-51. Allen has no idea what the "Classification" part refers to. T. 152. He could not even name the three broad adaptive behavior skill areas (conceptual, social and practical adaptive skills). T. 152. When asked whether he claims to be a specialist in the evaluation of mental retardation, he stated "it's not a specialty area of my practice." 5/23/2006 T. 7.

Allen's responses were not those of a witness caught by surprise or given no time

---

[1] There are eight transcripts from the evidentiary hearing. One for each day, but two for the second day of the hearing. The transcripts from the first five days are numbered "Volume l" through "Volume V." The last two days are not numbered. For this reason, Williams will refer to the transcript by its date and page number, rather than volume number and page number.

to prepare.[2] He had started working on this capital mental retardation case the year prior, issued a report, and knew of the evidentiary hearing months in advance. Williams objected to Allen giving an opinion whether Williams was mentally retarded under *Daubert* and Rule 702. 5/22/2006 T. 152-53. The question to be answered in the case is whether Williams is mentally retarded under Texas law, which means using the *Briseño* and AAMR definition. Allen testified that he does not know *Briseño* and does not know the AAMR definition. Allen may be qualified to discuss aspects of testing, but not to render an opinion on whether Williams is mentally retarded. The magistrate judge rejected Williams' objections to Allen giving an opinion on whether Williams is mentally retarded, stating that she does not "have to defer to a [sic] extremely narrow group of psychologists . . . ." and "I am not going to buy that only people that belong to the AAMR can answer this particular question." 5/22/2006 T. 154-55. Of course, Williams neither suggested the court rely on a narrow group of psychologists or that the psychologist must "belong" to the AAMR. Williams does suggest that to give a reliable opinion on MR in this case, under *Daubert* and Rule 702, the psychologist must know and apply, with experience and skill, the correct definition of MR. This definition is based on *Briseño* and the AAMR definition. The magistrate judge misstated and misunderstood the objection. Surely it is not a burden on the state of Texas to find an expert with minimal experience with mental retardation who can read and apply the AAMR definition? The magistrate judge not only admitted the opinion of Allen, but found his opinion more credible than that of Williams' well qualified experts. M&R at 75.

---

[2] Yet Allen was even unable to state when he was first contacted about the case, answering that he had "no idea" when he started working on the case but "assuming" it was 2005. 5/22/2006 T. 134.

## II. Williams' Intellectual Functioning is Two Standard Deviations Below the Mean

It is undisputed that Williams scored a full scale IQ of 70 or 71 on three separate tests by three separate examiners from 1992 to 2006. Despite these undisputed results, the Magistrate Judge concluded that Williams' IQ is not two-standard deviations below the mean. M&R at 73. The Magistrate Judge's findings and conclusion are erroneous. The Magistrate Judge primarily relied on the State's expert testimony of "Williams' higher academic achievement and evidence that Williams may have malingered on the [IQ] tests." First, the court should not have even admitted Allen's opinion, let alone heavily relied on it, regarding Williams' scores on achievement tests (TAAS) in high school. The State's expert apparently thought so little of the achievement tests that he did not even mention them in his report – no discussion of Williams' school achievement tests whatsoever.

Williams completed three IQ tests, the first in 1992, and the other two in anticipation of this hearing. Williams scored a 70 in a 1992 WISC-III test by the school system, a 70 in a 2005 WAIS-III test by his own expert, and a 71 in 2006 SB-5 (Stanford-Binet) test by the state's expert. Those tests are made up of two major subparts, verbal and performance, which combined result in a full-scale IQ score. The Magistrate Judge found that Williams was capable of scoring "well outside the mentally retarded range" by choosing Williams two highest sub-part scores, his verbal IQ of 79 and Performance IQ of 77 from two separate tests. M&R at 71. This is an invalid methodology. Neither the state's expert nor Williams' expert testified that a valid IQ score may be obtained by taking the highest score from different subparts of different tests and combining them.

4

The court gives great weight to the fact that Williams was "capable of scoring a Verbal IQ of 79 and a Performance IQ of 77," noting that these scores are "well outside the mentally retarded range."[3] By using this assessment, the court disregards the fact that the IQ tests administered to Jeffrey Williams are meant to measure the broad spectrum of intelligence, and not merely these two categories.  This is important, because intelligence is more than simply verbal or spelling ability.

The Stanford-Binet Intelligence test used by Respondent's expert, Dr. Allen, tests Fluid Reasoning, Knowledge, Quantitative Reasoning, Visual-Spatial Processing, and Working Memory.[4] Each of these factors is tested in two separate domains, verbal and nonverbal, in order to accurately assess individuals with deafness, limited English, or communication disorders. Examples of test items include verbal analogies to test Verbal Fluid Reasoning and picture absurdities to test Nonverbal Knowledge.[5] The wide variety of performance measures tested assures that the test-taker's IQ can be comprehensively scaled with other test takers of the same age group.

The Magistrate Judge also found that Williams scores did not reflect his intellectual functioning because of Williams performance in school – his grades, his class rank and his scores on school achievement tests.  M&R at 71.  These findings and conclusion are erroneous.  Even Allen agreed that the best representation of intellectual functioning is IQ scores obtained from appropriate assessment instruments. 5.23/2006 T. 15-16.

---

[3] *Id.* at 71.

[4] *Stanford-Binet Intelligence Scales, Fifth Edition*. (2004). Retrieved July 22, 2004, from http://www.riverpub.com/products/sb5/index.html

[5] *Id.*

5

Under Texas law, such standardized intelligence testing *is* the measure of intellectual functioning. Texas Health and Safety Code § 591.003(13) defines "mental retardation" as "significantly subaverage general intellectual functioning that is concurrent with deficits in adaptive behavior and originates during the developmental period." Section 591.003(20), in turn, defines "subaverage general intellectual functioning" as "measured intelligence on standardized psychometric instruments of two or more standard deviations below the age-group mean for the tests used." Allen, the state's expert, agreed with this. 5.23/2006 T. 15-16.

The relevant inquiry, then, is into an offender's "measured intelligence." Although the definition adopted by the *Briseño* court arose in a different context, that definition demonstrates that the Texas Legislature has rejected an approach general clinical estimate of intelligence in favor of a more objective reliance on measured intelligence. Following the approach of the Texas Legislature, it is clear that Williams' measured intelligence prior to age 18 is two standard deviations below the mean. Williams' pre-18 testing shows an IQ score of 70. The Director has not offered any specific criticism of this testing or of the test administrator. T. 5/22/06 at 178-79; 5/23/06 at 19-22.

In addition, the Texas definition of mental retardation and subaverage general intellectual functioning resolves the separate question of assessing general intellectual functioning in light of achievement testing. Standardized psychometric instruments test a great deal more than academic achievement. T. 4/19/06 at 71-74, 106; 4/20/06 at 42-51. The Texas Legislature has chosen measured intelligence on standardized psychometric instruments as the criterion for mental retardation, the same approach which Williams'

experts endorsed. T. 4/20/06 at 51-55.

The Texas approach is nothing novel; it is exactly the approach endorsed by the AAMR. The Red Book instructs that, "Intellectual functioning should be measured using individually administered standardized psychological tests and administered by appropriately trained professionals." Red Book at 52. A clinical judgment, or "best estimate," approach is only used when appropriate standardized measures of intelligence are not available, usually due to cultural factors. Red Book at 51-52.

Even if this Court expands the meaning of subaverage general intellectual functioning beyond the boundaries laid down by the Texas Legislature and AAMR, Williams has carried his burden of demonstrating such subaverage functioning. Dr. Allen and Dr. Kessner suggested several factors which could have affected Williams' pre-18 IQ score, but neither testified that they found any specific evidence of those factors at play. T. 4/20/06 at 38-39; T. 5/22/06 at 178-80.

Indeed, the most powerful evidence of intellectual functioning in the case is the consistency of Williams' full-scale IQ score over time and between evaluators. 4/19/06 at 106-10; 4/20/06 at 55, 121.

Given that Dr. Allen has rejected the suggestion that Williams would target a certain score, T. 5/22/06 at 175, the Director is left with chance as an explanation for Williams' consistent scores. But the internal structure of the tests rebuts the idea that chance is at work. Although Williams did not know the subtest structure of the test or how many questions would be asked, in the vast majority of cases Williams correctly answered easier questions and missed harder questions. T. 5/23/06 at 36-54. Rather than a monumental coincidence stretching over 15 years, the best explanation for Williams'

7

consistent IQ scores is that the IQ scores accurately reflect his broad intelligence.

The data rebut even Dr. Allen's most powerful argument, Williams' poor performance on the GWMT. The significance of the GWMT score rests on the assumption that a testing subject's malingering strategy will persist throughout testing. T. 5/23/06 at 36. But in the pre-18 testing, Williams scored relatively well on the Woodcock-Johnson test of academic achievement, with some scores in the low average-average range. The Director cannot maintain that William adopted a strategy of "effortful failure" with respect to the IQ test, but gave his best effort on the contemporaneous achievement testing. Indeed, Dr. Allen did not advance this proposition. The better and simpler explanation is that the testing reflects Williams' actual abilities, and his academic performance is stronger than his broad-based intelligence would lead one to predict. The tester considered this the most likely explanation, and this Court should do the same. The Magistrate Judge also put too much weight on several witnesses who testified that they did not consider Williams mentally retarded. These witnesses also testified that they did not know the definition of mental retardation. And some people did consider him retarded. Williams was referred to as "retarded." EH 4/17/2006 at 15. (acknowledged by P at 23). Ron Johnson and others thought he might be mentally retarded. 4/17/2006 at 175, 303. Williams' friends considered him not "sane" and "crazy" in regards to actual mental illness. 4/17/2006 at 164. Braggs said he didn't know if Williams was retarded. 4/19/2006 at 28, when pressed he had a lay definition of retarded that does not approach the AAMR definition. 4/19/2006 at 29. The state's witness on direct answered that he didn't know what was meant by mentally retarded. 4/21/2006 at 17. And he admitted that he did not consider

himself qualified to express an opinion about mental retardation. 4/21/2006 at 30. The state's witness, Hazel Garcia, described Williams as "special . . . slow, retarded to a sense." 4/21/2006 at 58. As the responses of the lay witnesses themselves attest, it is inappropriate to put much, if any, weight on lay person testimony regarding the definition of mental retardation or whether Williams fits that definition.

        Finally, the Magistrate Judge relied letters written in Williams handwriting to find that his IQ was not in the bottom second percentile, and she discounted much testimony that others wrote the letters for Williams. She discounted Respers' testimony, 4/18/2006 at 107-56, simply because the State was able to show that he could not remember exactly what words he had helped Williams with on a letter. Respers testified on direct that he had written 90% of Williams Navy appeal letter, and on cross revised that to 75-80%. Respers had had no prior or subsequent relationship with Williams and no motivation to lie. The record is replete with witnesses helping Williams with written work. Williams had great difficulty passing the basic tests for enlisted men in the Navy. 4/18/2006 at 20-22. He wouldn't have made it through boot camp without the tremendous support of others. 4/18/2006 at 25. Williams could not fill out job applications on his own. 4/17/2006 at 2__; 4/18/2006 at 39-40. Williams failed the written driver's test in Illinois three times. 4/18/2006 at 41. He only got his Illinois license with a lot of help from a friend. 4/18/2006 at 41-42. Williams failed the entry test into boot camp. 4/18/2006 at 11. People in the Navy helped him write when he tried to write a letter. 4/18/2006 at 113. His writing was incoherent. Death row inmate Coleman testified that he wrote letters for Williams and helped him with other things that were written. 4/18/2006 at 262-300. Williams was limited the number of witnesses that testified from death row to

two. 4/18/2006 at 302. Coleman was not effectively impeached in any way, and Pippin testified to the same thing. 4/18/2006 at 306-09. The Magistrate Judge found that Coleman's testimony was unbelievable and that he could not have helped Williams write letters, but the State's witness, Major Nelson, also testified that inmates communicate in the way Coleman described. 5/22/06 at 2-67.

Williams' pre-18 IQ score of 70, confirmed by adult testing, establishes that Williams has measured intelligence approximately two standard deviations below the mean, clearly satisfying Texas' definition of significantly subaverage general intellectual functioning. *See In re Hearn*, 418 F.3d 444, 448 n.4 (5th Cir. 2005) (considering a Full Scale IQ score of 74 to satisfy Texas' intellectual functioning definition).

### III.   Williams Has Significant Adaptive Limitations in at Least Two Areas of Adaptive Functioning.

The Magistrate Judge's findings and conclusion that Williams does not have significant deficits in at least two areas of adaptive functioning is erroneous. The magistrate judge's findings in this regard are superficial, conclusory and miss important facts in the record. For example, the Magistrate Judge notes incorrectly and without *any* elaboration, that "Williams was able to rent an apartment in Gary, Indiana, and buy at least two vehicles, one in Indiana and one in Houston, without assistance. He was able to wash his clothes. M&R at 75.

*Williams was Unable to Rent and Live in an Apartment Independently*

The Magistrate Judge's notation that Williams was "able to rent an apartment" is, strictly speaking and in a very narrow sense, correct. But the Magistrate Judge is incorrect that Williams' rental of an apartment was successful or an act that militated against finding a deficit in adaptive skills. The Magistrate Judge fails to note the

uncontroverted testimony that as a young adult, Williams made only one attempt to live on his own (in Gary, Indiana), and it ended with Williams homeless and starving. Before renting the apartment in Gary, Indiana, Williams was completely dependent on a friend from the Navy, who provided room and board and other assistance for him. 4/18/2006 at 91-92, 96. Williams did not understand the good deal he was getting, and so tried to get his own apartment. 4/18/2006 at 94. The apartment was too far from Williams' work. 4/18/2006 at 58. Williams had "nothing" in the apartment. 4/18/2006 at 62. He had no furniture, no bed, no couch, no chairs and no television. 4/18/2006 at 62. Williams slept on the carpet. 4/18/2006 at 62. He never cooked there. 4/18/2006 at 51. He did not even have utensils or pots and pans. 4/18/2006 at 63. Shortly after getting the apartment, something went wrong with Williams' car. 4/18/2006 at 58. Because his car broke down and the apartment was so far from work, Williams missed too much work and got fired. 4/18/2006 at 58, 98. Because he did not have a way to earn money, he lost his apartment. 4/18/2006 at 58. Williams only paid the first month's rent and the deposit, he never made payments after that. 4/18/2006 at 63. The whole time he had spent in the apartment he had nothing in there. 4/18/2006 at 63. Williams was evicted. 4/17/2006 at 94. Williams not only lost his car, job and apartment, he was otherwise unable to take care of himself. 4/18/2006 at 66. "He looked bad . . . . You could tell he hadn't been eating." 4/18/2006 at 66. Williams looked "pretty ragged," he was "unkempt" and "lost a considerable amount of weight." 4/18/2006 at 188. The Youngbloods, Williams friend from the Navy, literally took him in for a couple of days and put him on a bus to Houston to his parents. 4/18/2006 at 67, 99, 188-89. Williams was not able to "function right by himself." 4/18/2006 at 67. It was only through "a lot of help" from his Navy friend that

he was able to survive for the short while that he did. 4/18/2006 at 68. The state's witness stated on cross-examination that if someone did not make him eat, he wouldn't eat. 4/21/2006 at 50. His meal would consist of "vanilla wafers." Id. Thus Williams' renting an apartment in Gary, Indiana, is not proof of adaptive skills, but rather proof that Williams had significant deficits in adaptive skills.

*Williams did not Buy Two Vehicles Without Assistance and His Ownership and Use of the Vehicles Showed Adaptive Deficits*

The Magistrate Judge is factually incorrect when she states that Williams bought two vehicles without assistance. He owned two vehicles, but only bought one without assistance.[6] And the broader picture shows that his ownership of the two vehicles was not successful or acts that militated against finding a deficit in adaptive skills.

Williams' friends testified that they never saw Williams drive, and he never had a license before going to the Navy. 4/17/2006 at 84. Although Williams had a car in Houston after returning from the Navy and Indiana, there was no testimony as to how he obtained the car and no testimony that he actually purchased the car himself. The car broke down quickly because Williams failed to put oil into it. 4/17/2006 at 215. Williams had to leave the car on the highway and never got the car fixed. 4/17/2006 at 234. Williams was oblivious at the time as to the problem with the car. 4/21/2006 at 56. Even though Williams had a car, he lost his delivery job because he couldn't find where he was going or use the map that he was given. 4/17/2006 at 217. Williams' friend explained to Williams how to use a map to find where he was going, but Williams never understood. 4/17/2006 at 217-18. Williams needed and wanted to read the map because

---

[6] The record reflects that Williams bought the car in Indiana. There is no testimony that Williams bought the car he owned in Houston, because he did not buy it, someone else bought it for him – but the record contains no evidence regarding who purchased the car in Houston.

his job depended on it.  4/17/2006 at 218.  When Williams drove the car, he wouldn't keep track of the gas gauge and would run out of gas.  4/21/2006 at 53-54.  His friends ended up checking on the gas themselves when they rode with him.  4/21/2006 at 54.

The only car Williams bought was his first car, in Indiana, after he left the Navy. He also had no concept that that car needed maintenance.  4/18/2006 at 60.  Williams didn't understand about putting oil in the car.  4/18/2006 at 61.  Shortly after getting the car Williams drove over a median strip and "broke the tie rod on the car."  4/18/2006 at 64.  Williams kept driving the car and the wheel fell off.  4/18/2006 at 65.  Because the car broke down, Williams could not get to work and lost his job and his apartment.

*The Finding that Williams was "Able to Wash his Clothes" is Misleading*

The fact that Williams was "able to wash his clothes" is unclear from the record. Witness after witness testified as to Williams being unkempt, not washing himself or his clothes, and failing to wear appropriate clothes for the weather.  It is clearly erroneous on this record to find from all the facts that the most salient point regarding his clothing is that Williams "was able to wash his clothes."  Friends testified that before Williams went to the Navy, Williams never washed his own clothes.  4/17/2006 at 82.  In the Navy the laundry was done for them.  4/18/2006 at 84.  When he lived in Indiana he never washed his clothes.  4/18/2006 at 184.  When Williams lived with he friend Reginald Tolbert after the Navy, Williams would "very seldom" wash his clothes.  4/17/2006 at 258. Witness after witness testified that Williams' dress was unattractive and inappropriate for the weather.  4/17/2006 at 288, 301.

*The Finding that "No witness testified . . .that Williams had body odor" is Wrong*

The Magistrate Judge found that "[n]o witness testified . . . that Williams had

13

body odor or appeared otherwise unclean." M&R at 75. This is false, and in any event misses the point of pages of testimony from several witnesses to Williams' inability to take care of his own hygiene.

Ron Johnson testified that Williams had an offensive odor from not taking a bath. 4/17/2006 at 76-77. And that he and his mother would have to tell Williams to take a shower and change his clothes. Id. at 77. Devin Wilburn testified that, after Williams got back from the Navy, Williams would wear the same clothes for 3-4 days in a row. 4/17/2006 at 288. Wilburn would take Williams aside and explain: "go clean up a little bit, wash up, man, you got a little, you know, a little funky a little bit."[7] Id. Even after Williams left the Navy he continued his habit of wearing the same clothes without changing them. 4/17/2006 at 288; 4/18/2006 at 179. When Williams lived in Indiana with the Youngbloods, Padricia Youngblood "made him take a bath." 4/18/2006 at 180. Other than that Williams would "never take a shower, never wash himself up." 4/18/2006 at 180. Even in the Navy, he wasn't seen taken a shower. 4/18/2006 at 206. The state's witness, Hazel Garcia, called to testify about Williams' body odor simply stated "Well I mean he didn't stink because he stayed in the house all the time but I mean like I said I seldomly [sic] saw him bathe." 4/21/2006 at 48. On cross, she admitted that basically Williams didn't have any hygiene. 4/21/2006 at 51. Williams didn't stink because he wasn't active. 4/21/2006 at 51. But others told him to bathe. 4/21/2006 at 51-52.

*Most of Williams' Behavior Cannot be Explained as "Attention-Getting"*

The Magistrate Judge concludes her factual misstatements by describing the sum

---

[7] Funky in this context means "strongly musty." Oxford American Dictionary.

of Williams' behavior as "just as easily seen as attention-getting behaviors as they are evidence of mental retardation." M&R at 75. While some of Williams' behavior could be described as either attention-getting or evidence of mental retardation, such as his misbehavior at school or verbal outbursts, much of his behavior cannot in any way be interpreted as "attention-getting." For example, his behavior above, losing the apartment and starving, losing his cars, and failing to wash himself or his clothes.

Other examples of behavior that cannot be interpreted as attention-getting include the following: Williams' haircut was odd and unattractive because he'd do it himself instead of going to a barber. 4/17/2006 at 222-23. Ron Johnson testified that Williams was unable to play video games or sports. 4/17/2006 at 80-81, 159, 206, 279. Williams wanted to play basketball correctly, but was unable. 4/17/2006 at 169-70, 203, 283-84. Watching Williams play was like "watching a five-year-old trying to shoot." 4/17/2006 at 204. Williams was the only one of his group that was unable to "rap." 4/17/2006 at 281. Williams was a "consummate follower." 4/17/2006 at 86. He would follow "blindly." 4/17/2006 at 161, 284-85. He would never give advice, but always be given advice, even by his younger peers. 4/17/2006 at 225. His non-sensical interjections into conversations were considered by his peers to be because of his lack of understanding and low intelligence. 4/17/2006 at 152, 154. If Williams' behavior was attention-getting, one would expect him to at least occasionally date, but numerous witnesses testified that Williams never went on dates with women. 4/17/2006 at 156, 210, 290; 4/18/2006 at 55, 186, 211; 4/19/2006 at 36; 4/21/2006 at 59. Williams' friends would pick on each other and mock each other occasionally, but they wouldn't do it with him because Williams was "different," he couldn't handle it. 4/17/2006 at 207. Williams' friends stuck with

him even though he didn't contribute because he was "part of our family," and because Williams was "loyal." 4/17/2006 at 209. Williams' friends helped him fill out job applications. 4/17/2006 at 226. He was unable to cook. The one time his roommate saw him attempt to cook, he still remembers the "smell and the smoke." 4/17/2006 at 229; 4/18/2006 at 181. Williams never read anything. Tolbert. 4/17/2006 at 285. Williams' peers rejected the state's suggestion that Williams' behavior, such as wearing a coat in the summer, may have been to get attention. 4/17/2006 at 303-04 (in Houston). Multiple witnesses testified to Williams wearing coats in the summer. 4/18/2006 at 53 (in Indiana), 179 (in Indiana), 206, 248-50 (in the Navy). The state's own witness, when asked whether he thought Williams was mentally retarded, volunteered that he thought it was odd that Williams wore a wool peacoat in the hot summer. 4/21/2006 at 18. Williams was unable to stand straight in formation. 4/18/2006 at 13. Although he was in the Navy, he had great difficulty passing the swimming test. 4/18/2006 at 17. And he held the lowest possible job in the Navy. 4/18/2006 at 193. But he still needed "Extra Military Instruction" and counseling. 4/18/2006 at 202. Williams did not even know his own rank when he was in the Navy. 4/18/2006 at 204. He was unable on his own to do simple tasks such as folding his shirt and making his bed the right way. 4/19/2006 at 23. Yet Williams tried, he wanted to do things the right way. 4/19/2006 at 23, 25. And the record is replete, from beginning to end, with witnesses testifying that Williams was unable to complete the basic task of shaving, that he repeatedly shaved over bumps on his face leaving his face tore up with cuts.

In sum, the record reflects that Williams possessed significant adaptive functioning deficits in the area of conceptual skills, that is, language (receptive and

expressive), reading and writing, money concepts, and self-direction. Williams possessed significant adaptive functioning deficits in the area of social skills, that is, interpersonal relationships, responsibility, self-esteem, gullibility (likelihood of being tricked or manipulated), naiveté, following rules, obeying laws, and avoiding victimization. Williams possessed significant adaptive functioning deficits in the area of practical skills, that is, activities of daily living (eating, transfer/mobility, toileting, and dressing), instrumental activities of daily living (meal preparation, housekeeping, transportation, taking medication, money management, telephone use), occupational skills, and maintaining safe environments. The evidence supports that Williams' significantly subaverage general intellectual functioning and significant adaptive functioning deficits had its onset before age 18.

*The Court Failed to Address the* Briseño *factors*

The Magistrate Judge did not address the *Briseño* factors other than the definition of mental retardation under the AAMR. The *Briseño* factors, based on the evidence at the evidentiary hearing cited above, also militate for a finding that Williams is mentally retarded. Williams' conduct is impulsive rather than demonstrating the formulation and execution of plans. In general, Williams' conduct shows that he is led around by others rather than demonstrating leadership. Williams's conduct in response to external stimuli is often irrational and inappropriate. Williams's responses often wander from subject to subject rather than responding coherently, rationally, and on point to oral or written questions. In general, Williams cannot effectively hide facts or lie in his own or others' interests. Putting aside any heinousness or gruesomeness surrounding the

capital offense, the commission of Williams' offense did not require forethought, planning, and complex execution of purpose.

> IV. **The Burden of Proof Should be on the State to Prove Beyond a Reasonable Doubt that Williams was not Mentally Retarded.**

On March 13, 2006, Williams filed a motion arguing that under the Fifth, Eighth, and Fourteenth Amendments, this Court should allocate the burden of persuasion to the Warden to prove Williams is not mentally retarded beyond a reasonable doubt. DE #86. The Magistrate Judge denied this motion. DE #101. Williams acknowledged that the 5th Circuit has ruled against him on this issue and the motion was filed to preserve the issue for appeal. DE #86 at note 1. It is raised here to preserve the issue for appeal.

### Conclusion

The Magistrate Judge in this case made several credibility determinations, and each one went against Williams. Most incredibly, she found Dr. Allen, who, Williams asserts, is not even qualified to give an opinion whether an individual is mentally retarded under the Texas definition, more credible than Williams' experts. The Magistrate Judge made factual findings that are clearly incorrect based on the record. And she endorsed questionable methodologies, such as relying on Williams' achievement test scores for IQ determinations when the State's own expert did not think them important enough to even put in his report. Yet the Magistrate Judge still found that "[t]his is a close case." M&R at 77. Taking into consideration all of the documentary and testimonial evidence, the opinions of the experts, the demeanor of the witnesses, and the arguments of the parties, Williams has established by a preponderance of the evidence that he is mentally retarded.

              Respectfully submitted,

s/Jonathan P. Sheldon
10621 Jones Street, Ste. 301A
Fairfax, VA 22030
Office (703) 691-8410
Mobile (703) 635-4164
Fax (703) 251-0757
Jsheldon@DevineConnell.com
SDTX No. 36056
D.C. Bar No. 462101

Anthony S. Haughton
3013 Fountain View, Ste. 145
Houston, TX 77507
Office (713) 995-7776
Mobile (832) 287-9548
Fax (713) 953-7482
ashaughton@aol.com
SBOT No. 09234150

**CERTIFICATE OF SERVICE**

I, Jonathan P. Sheldon, hereby certify that on January 29, 2007, I caused a true copy of these Proposed Findings of Fact to be served on Assistant Attorney General Georgette Oden, counsel for the Respondent, electronically by means of this District's CM/ECF system.

/s Jonathan P. Sheldon