IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JEFFREY DEMOND WILLIAMS, | § | |
| Petitioner, | § | |
| | § | |
| v. | § | CIVIL ACTION H-04-2945 |
| | § | **CAPITAL LITIGANT** |
| NATHANIEL QUARTERMAN, | § | Hon. Nancy K. Johnson |
| Director, | § | |
| Texas Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| Respondent. | § | |

**RESPONSE TO WILLIAMS' OBJECTIONS**

Williams would have this Court believe that only psychologists who exclusively focus their practice on mentally-retarded people can diagnose those with MR. This is flatly wrong, as Magistrate Judge Johnson noted, and fortunate for Williams, since one of his experts falls short of such a demanding standard. EH 052206 154-55. The scientific standard of care for forensic psychology and Federal Rule of Evidence 702 establish the professional and legal standards guiding the process of diagnosing mental retardation. These standards contraindicate the approach taken by Williams in his objections and attest to the validity of the Magistrate's findings in the Memorandum and Recommendation ("Memorandum") in this case.

**ARGUMENT**

**A.     Dr. Allen provided a reasonable and scientifically-valid diagnosis that was based on relevant training, experience, and objectively-corroborated data.**

Rule 702 clearly contemplates some degree of regulation of the subjects and theories about which an expert may testify. "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue" an expert "may testify thereto." FEDERAL R. EVID. 702. The subject of an expert's testimony must be "scientific . . . knowledge." *Daubert v. Merrell Dow Pharmaceuticals, Inc.* 502 U.S. 579, 589-90 (1993). The adjective "scientific" implies a grounding in the methods and procedures of science. *Id.*

The aims of Williams' expert differ from the goals of the legal system and of the relevant scientific community. EH 052206 208. Garnett and the AAMR are *advocates* whose lobbying focuses on ensuring legal, financial and counseling benefits for all MR people, with an obvious bias towards granting the MR label to guarantee support services. *Id.* at 208-09; *Ex parte Briseño*, 135 S.W.3d at 6.[1] They are not neutral, objective scientists practicing forensic psychology, like Dr. Allen. EH 052206 209.

Dr. Allen's graduate training emphasized practical clinical experience grounded in the scientific method. *Id.* at 125. Dr. Allen spent seven years diagnosing and treating patients in the Rusk State Hospital, in the Maximum Security Unit for the Criminally Insane among others. *Id.* In other words, instead of approaching patients with a binary perspective (Is this person MR or not?) as Garnett does, Dr. Allen was viewing patients without limiting the possible diagnosis beforehand and testing a variety of hypotheses against the facts, to reach scientifically- and medically-reasonable diagnoses. While there, Allen diagnosed and treated many with mental retardation. *Id.* at 126. He spent several months on a unit specifically for the mentally retarded. *Id.* at 128. His time on the Developmental Unit exposed him further to varying ailments in children and teenagers, from conduct disorder and mental illness to mental retardation. *Id.* at 129. Allen's postdoctoral internship at a psychiatric hospital honed his skills at differentiating mental retardation from other illnesses or conditions. *Id.* Allen spent years of his private practice concentrating on treatment, counseling, and behavioral medicine. *Id.* at 140-41. Allen's practice places particular emphasis on systematic, empirical, reliable and scientific procedure. *Id.* at 134-5. At worst, Dr. Allen does not actively socialize with MR people, *id.* at 150, but the Magistrate was correct in finding that he has the education and experience necessary to differentiate between mental illness, personality disorders,

---

[1] "The functioning level of those who are mildly mentally retarded is likely to improve with supplemental social services and assistance. It is thus understandable that those in the mental health profession should define mental retardation broadly to provide an adequate safety net for those who are at the margin and might well become mentally-unimpaired citizens if given additional social services support." *Briseño*, 135 S.W.3d at 6.

and mental retardation, especially in the legal context where risk of malingering is high and the need for accuracy is acknowledged by all. *Id.* at 179-80; 4 EH 31; Memorandum at 66-9.

Ironically, Dr. Kessner, the first expert to testify for Williams, didn't even major in psychology or receive any pre- *or* post-doctoral training in intellectual assessment or mental retardation, aside from "on the job training" after her doctoral degree was awarded. 3 EH at 122-3. She agreed with Judge Johnson that one can be competent to diagnose MR without specializing in MR. *Id.* at 136.

Dr. Allen used the Diagnostic and Statistical Manuel, Fourth Edition ("DSM 4") to guide his diagnosis of Williams. EH 052206 158. The criteria in the DSM 4 are those relied on by psychologists, the AAMR, and by Williams' expert Dr. Garnett for diagnosis of MR. *Id.*; 4 EH 125. Allen was more familiar with relevant research in such prestigious publications as *Mental Retardation*, *Journal of Consulting and Clinical Psychology*, *Journal of Forensic Psychology*, *Journal of Forensic Neuropsychology*, and the *Journal of International Forensic Psychology* than either of Williams' experts were. EH 052206 172, 174; 3 EH 252-6; 4 EH 34-7, 192-3. Allen used the Vineland to assess Williams' adaptive behaviors, not for its statistical reference but for clinical guidance, emphasizing its empirical benefits while acknowledging its limitations for providing a numerical "score." EH 052206 at 162-3. Dr. Allen was the only expert to use a reliable and valid test of effort as part of his testing battery. *Id.* at 164, 170-4. In part because Dr. Allen adhered most closely to the scientific standards of his profession and the Rules of Evidence, the Magistrate properly found him more credible than either of Williams' experts. Memorandum at 70-75.

**B.     Williams' intelligence has not been accurately measured because Williams has yet to exert full effort on any full-scale IQ test. Nonetheless, because effort is responsible for fifty percent of the variance from the mean, his IQ can be estimated at 90, far above the *Atkins* threshold.**

Williams' only argument regarding the validity of his IQ scores completely misses the point. According to Williams, "[t]he relevant inquiry. . . is into an offender's 'measured intelligence'";

testing thus far shows Williams' IQ in the 70 range, *ergo* he meets the first prong of *Atkins*.[2] Objections at 6. This tautology does not help Williams, because if the testing is demonstrably invalid, the measurements are meaningless. Memorandum at 71.

First, his intelligence is greater than the IQ scores reflect, as empirically proven by his actual performance in various intellectual tasks including school, work, and interactions in the world. Granted, he wasn't the sharpest tool in the shed, but *Atkins* did not prohibit the execution of stupid murderers. Williams has to show he is more than just dumb to counter the Magistrate's findings on this point..

Second, Williams' insistence that similar IQ scores over time must therefore be accurate is unsubstantiated and incorrect. Williams cited a study to the Magistrate in his post-hearing briefing, allegedly presented by anti-death penalty activist Denis Keyes at the American Psychological Association Annual Meeting in 1993, but failed to attach it to his brief as claimed. Post-Hearing Brief at 11. Further, a search spanning 1981 through 2006 uncovered no such paper, and no such presentation occurred at the referenced meeting.[3] (*See* Exhibit A, Search Results from APA's PsycNET, August 15, 2006, and Exhibit B, Minutes from 1993 Annual Meeting)(attached to the Director's Reply Post-Hearing Brief). In any event, this study is inadmissible hearsay. FEDERAL R. EVID. 802; EH 052306 59.[4] Rather than targeting a particular score, Williams merely gave less than full effort on his tests. EH 052206 178-181; EH 052306 135-6. Williams' proposition fails to

---

[2] *Atkins v. Virginia*, 536 U.S. 304 (2002).

[3] The fact that opposing counsel was unable to provide the Director's expert a copy of this study during the hearing, and that it cannot be found in a thorough search of the literature, lends further support to the undersigned's *Daubert* objection to testimony regarding conclusions that Williams exerted full effort on his IQ testing because of the similarity in scores over time. *See* 3 EH 109 (*Daubert* objection during hearing).

[4] During the hearing, this Court permitted discussion of the study only to "test [Allen's] familiarity" with it, and opposing counsel specifically limited his reference to the material, saying he was "not offering it for the truth. . ." EH 052306 59. Further predicate for the introduction of this study was never laid.

acknowledge the distinction between consistency and validity. EH 052206 177. Just because someone gets two similar test results (consistency) does not mean those tests accurately measured what they purport to measure (validity). *Id.*

The Keyes study also did not examine sub-score inconsistencies. Recall that Williams' verbal and performance scores reversed themselves over time– at age 16, his verbal IQ was 79 and the performance IQ was 65, while on death row his verbal IQ was 70 and his performance IQ was 77. 3 EH 73-4, 99; PX 39[5] at 17; RX 42. In fact, Williams' fourteen point improvement in performance IQ and nine point decline in verbal IQ is inexplicable, unexpected, statistically significant, and contraindicates both a "targeted" score and a valid test. Memorandum at 71; EH 052306 134, 140-1.[6] This flip-flop is yet another indication of the inaccuracy of his IQ measurement over time, due to his less-than-full effort. *Id.* at 142-3. The fluctuation shown in his achievements (whether in classes, on standardized testing, or in the real world) demonstrates the truth of Allen's conclusion– effort is the key determining factor explaining variance or difference from the average IQ score. Memorandum at 71; EH 052206 184-5.

The Magistrate correctly resisted Williams' false dichotomy. While everyone agrees Williams did not target a particular score, he contends "chance" is the only explanation for his similar scores over time, if those scores are not accurate measures of his intelligence. Objections at 7. Actually, his scores' similarity is due to similarly poor effort (which requires nothing like

---

[5] "PX" signifies the Petitioner's Exhibits, followed by page number(s).

[6] The DSM-IV-TR warns that IQ testing which does not take these additional factors into account may produce a misleading result:

> When there is significant scatter in the subtest scores, the profile of strengths and weaknesses, rather than the mathematically derived full-scale IQ, will more accurately reflect the person's learning abilities. When there is a marked discrepancy across verbal and performance scores, averaging to obtain a full-scale IQ score can be misleading.

DSM-IV-TR at 42.

surgical precision), not chance.  EH 052306 45-6, 58, 133-6.

> **Q** If Mr. Williams wasn't targeting a specific number on the score page, because he didn't have access to Appendix A and B, what could he be feeling or assessing in himself as he's doing the test?
> **A** Again, it comes back to effort.  "I don't want to answer much in the way of items that call for the slightest of effort, or minimal effort."  Some items I'm going to say, "oh, I can't do that" before I even start.  And other items, I'll perform a little bit.  And somewhere in there, I have to subjectively feel "Is that all the grip I'm going to give?  Is that all the effort I'm going to give?"  So it's a subjective state.
> **Q** Does he need to know how many questions are on a specific test slate to know when to start failing?
> **A** No.  No.  It's purely a matter of effort, and can you at least apply that effort somewhat consistently over the course of a one hour exam.  And yeah.  The answer's sure.

EH 052306 135-6.

Williams also points to his performance on the Woodcock-Johnson Achievement Test as proof that he "gave his best effort" that day (including the IQ test).  Objections at 8.  Nothing in the record indicates that Williams' relatively higher scores on the Woodcock-Johnson reflect his best efforts.  The factors identified by Kessner and Allen that negatively influence effort could easily have been present in varying degrees during the lengthy day of testing endured by the teenage Williams.  EH 052206 181-82.  Williams' high school test administrator implicitly questioned the accuracy of that IQ result because she commented that Williams stopped trying when the problems became more difficult, and acknowledged that his actual achievement (presumably on the achievement test, or possibly his class performance) exceeded that predicted by his IQ score.  RX1 at 42, 46.  However, at that time effort testing as we know it did not exist, and as a clinician, Joyce Hood had no motive to suspect malingering.  EH 052306 129-30.[7]  As discussed earlier, Hood was also emotionally

---

[7] "[T]he devices for assessing effort didn't exist then like they do now.  And even then, in an educational environmental, you probably wouldn't assess malingering.  It's a necessity in a forensic environment if you're going to go to Court, or settle a case, a civil litigation case.  But in non-litigation environments, they often don't do anything to assess malingering, other than make the clinical observation.  It is important, but I -- in looking at that data, I knew she couldn't have assessed malingering then the way we can now. . . .  And when you're in a clinical relationship with someone, as opposed to a forensic relationship, your orientation is to be supportive and to believe

invested in her IQ results. 3 EH 190. Thus, her opinion that his IQ score validly measured his intellect merits little weight, if any.

   Logically, as the Magistrate noted during the hearing, people cannot perform at a level greater than their capacities. 3 EH 139-40. Williams' accomplishments in school alone surpass the capabilities of someone with mental retardation. EH 052306 150. If Williams were not conduct disordered, affected by ADHD, home life issues,[8] and possible learning disabilities, he would likely have had better grades more consistently. His mother testified at trial that Williams was capable of doing his school work but chose not to, preferring acts of vandalism. 22 Tr 64.[9] In middle school, his MAT results displayed more than mere memorization with scores at or above grade level on total math, math concepts, language, basic battery and comprehensive battery, and science. RX1 at 9. Williams mastered persuasive writing, relationships and outcomes, inferences and generalizations, point of view, propaganda, number concepts, and algebraic/math relations in the ninth grade, before any special education placement, for his first TAAS test. *Id.* at 10. As "intelligence" means the capacity for "reasoning, planning, solving problems, thinking abstractly, [and] comprehending complex ideas," his mastery of these topics (on a test which compared his performance with other ninth-grade students across the state) further indicate that his intelligence was at least normal for his age at that time. Red Book at 40.

   During sophomore year, he earned (in regular education classes) an A and a B in English, a B in Wildlife (Science?), and Bs in Chemistry, but failed Algebra. RX1 at 2. At age sixteen it was noted that Williams' inappropriate feelings and behavior, *not* an inability to learn, affected his

---

them. It's just different, because you're more skeptical in a forensic relationship." Dr. Tom Allen, EH 052306 129-30.

 [8] *See, e.g.,* 1 EH 62 (Williams hints at horrible events in the family but will reveal nothing further to his friend).

 [9] "Tr" signifies the transcript of proceedings at trial, submitted to the Court after the hearing for judicial notice of those proceedings. This abbreviation is preceded by volume number and followed by page number(s).

educational performance. *Id.* at 26. The grade equivalencies on the Woodcock-Johnson at age 16 were everywhere from sixth grade in math applied problems and punctuation, to tenth grade in word usage, to eleventh grade in math calculation and spelling. *Id.* at 47-8.[10] Logically, IQ scores and intelligence are "highly correlated" with academic performance. EH 052206 183. The fluctuation in Williams' grades, both within classes and within semesters, can be attributed mainly to effort, with possible complications from learning disabilities, conduct disorders, and/or truancy. *Id.* After discharge from the Navy, Williams got 100% right on his employer's test and understood words like 'flammable,' 'corrosive,' and 'toxic.' RX4 69. While on death row, he correctly uses words such as 'carefree disposition,' 'discourse,' and 'manifests' in correspondence with friends. RX10A. Garnett absurdly insisted that Williams has subscriptions to "*Spiritual Health*" and "*Essence*" magazines, and checks out like-themed books by Jung, Huxley, Ellis, Kerouac and Brown[11] from the prison library (3 EH 223-228; RX8) because he wants to "impress the guards or the other inmates," or because he's using them to "learn words." 4 EH 154-5. Neither is an objective, scientifically-reliable explanation for the conflict between that data and a diagnosis of MR. EH 052206 183.

The fact that Williams' "performance is stronger than his broad-based intelligence would lead one to predict" is a critique of the accuracy of the IQ testing, not an indicator of a strength within mental retardation. Objections at 8; EH 052206 182. Allen described the most recent research

---

[10] Common sense indicates that the variance between a sixth grade-level score on math applied problems and an eleventh grade-level score on math calculation points towards Williams exerting inconsistent effort during the test.

[11] *Manchild in the Promised Land* (Claude Brown) is a 1965 novel about black children growing up in crime-plagued Harlem who struggle with race, poverty, sex, family, friendship, religion and education. Not coincidentally, it meshes well with the other "black identity" literature discussed by the "roundtable" group. *See, e.g.,* 1 EH 63 ("At that time in the early to mid-'90s we were into reading books that promoted African-American identities, such as Marcus Garvey, Malcolm X, Farrakhan, and we would hold roundtable discussions among friends. . . [W]e would discuss. . . economic empowerment of the Black community, our own– the necessity for us to support African-American colleges, the social injustices that we felt at the time in terms of police profiling.")

which confirms that IQ scores and effort scores have a "huge," nearly perfect correlation. EH 052206 168-9. Because of this research and Williams' performance on the GWMT, Allen estimated Williams' actual IQ as 1.28-2 standard deviations above his current measured IQ, or 90. EH 052206 237-8; RX 41. This remains uncontradicted by any evidence. Memorandum at 73.

As both Kessner and Allen explained, test administrators become personally "invested" in the IQ score they obtain and likewise are unwilling or unable to explain away the conflict with ordinary observations of achievement and ability.[12]  3 EH 190; EH 052206 182. It's like saying testing reveals muscles too weak to lift the arms, when the person is observed throwing a baseball numerous times in the ordinary way. EH 052306 144. Common-place observations and IQ results are in conflict in Williams' case. Objective measurements of effort, without an agenda towards one label or another, indicate the IQ scores obtained are inaccurate. The Magistrate properly put her faith in reason, common sense, and Williams' ordinary observable abilities. Memorandum at 72.

**C.     None of Williams' behaviors were caused by a lack of intelligence. Rather, he exhibits the predictable symptoms of ADHD, oppositional-defiance, conduct disorder and anti-social personality disorder, coupled with standard adolescent issues.**

Williams' entire case posits the *Atkins* definition in reverse: instead of determining that Williams is MR and then prohibiting his execution – because of a variety of characteristics determined by the Supreme Court to diminish the moral blameworthiness of most MR people– Williams hopes this Court will look at the list of characteristics quoted from *Atkins* and find him to be MR *if* he exhibits them. This is putting the cart before the horse, because most (if not all) violent

---

[12]    "I mean, when you compare his intelligence score at that time with what he was demonstrat[ing] in actual school grades and class work, compared to the achievement test scores at that time and a variety of behaviors he exhibited on a daily basis, and he wasn't functioning at an IQ of 70. He wasn't functioning in the MR range at that time. But her -- but Ms. Hood's statement is probably the same kind of statement I would have written in. It's the same kind of statement I and a lot of other psychologists have written for decades. They appear to be making good effort, and you never see us say they appear to be making good effort, but the results were invalid. You just never hear us say that." Dr. Tom Allen, EH 052206 182.

criminals who *aren't* MR also exhibit those characteristics.[13] Williams' approach would thus unlimit *Atkins*. This also further supports the Director's contention that behaviors must be *caused* by mental retardation to justify that diagnostic label. For example, Williams is supposedly a follower, yet Garnett initially dismissed every instance of independent thought or activity as an aberrant moment of strength or decried it as proof of Williams' strangeness. *See, e.g.,* 4 EH 191-2 (discussion of sightseeing alone in Thailand as indication of momentary, temporary ability or typical weirdness). Williams' insistence on the "deficits model" bias shows why a neutral and objective approach[14] to this diagnosis is scientifically and legally superior. Even Garnett had to admit that the "deficits" observed in Williams could also be explained by other diagnoses such as ADHD, conduct disorder, oppositional defiance, and learning disabilities. Memorandum at 74; 4 EH 142-3. Williams has failed to demonstrate the adaptive behavior deficits that are required under *Atkins*.

Collateral information about what Williams regularly does now, what he did in the Navy, and what he was capable of in his adolescent and childhood years all reveal a young man who *can* act normally but, perversely, often *chose* not to. Memorandum at 75; EH 052206 175. These choices were not the result of significantly subnormal intelligence, but a combination of factors including

---

[13]   "[D]iminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others. . ." *Atkins*, 536 U.S. at 318.

[14]   The Director notes that neither Garnett nor Kessner have ever testified on behalf of the State in any capital proceeding, *Atkins* or otherwise, whereas they testify quite frequently for the Defense. Allen exhibits no such bias (and in fact recently testified for the defense in Smith County that another defendant *is* mentally retarded.) EH 052206 133. In fact, Williams called as witnesses only his family, friends and his retained experts. The only "neutral" witness he called was Alexander Lee, a former supervisor in the Navy. Lee only worked with Williams for one month according to Williams' Navy records before Williams was transferred back to Deck Division; two months if you credit Lee's recollection. 2 EH pt. 1 at 192, 195; RX 3 at 110. However, Lee couldn't even approximate how big the *USS Mobile Bay* was (thinking it was 150 feet long, when really it is over 500.) 2 EH pt. 1 at 233-4; 5 EH 130-1. Nor did Lee, who criticized Williams' performance as helmsman, even know how the helmsman performed the duties of steering the ship. 2 EH pt. 1 at 237-8; 5 EH 140-1.

his personality disorder. EH 052306 154. For example, Williams never had or needed a "caregiver." EH 052206 160, 163. Instead, Williams adeptly manipulated and used those around him to extract the maximum benefit from a relationship with a minimum of effort. Rather than a "caretaker," he had enablers– people willing to pick up the slack out of pity (Padrica and Dwalon Youngblood), self-interest (Dwalon Youngblood), duty (Ron Johnson), adolescent camaraderie (Dana McCann, Reggie Tolbert), love (Wanda Williams) or pride (Hazel Garcia)– and enforcers, people who tried to make him to conform to expectations (unsuccessfully, more often than not). One such enabler was DeJulio Respers, who assisted Williams in writing his appeal letter to the Navy– not by composing seventy-five to ninety percent of the missive, but by merely by suggesting one or two phrases and correcting the spelling of one or two words, as he admitted during the "surgical" cross examination. Memorandum at 40-42; 2 EH, pt 1, 143-4, 150. The real element of enabling on Respers' part was seen in his willingness to do Williams' work after Williams screwed it up for others on the team. 2 EH pt. 1 126. Williams was able to foist his car maintenance off on others with similar success. His friends enabled his lackadaisical attitude by stepping in and doing it for him. 5 EH 54.

To claim that Williams is retarded because his adolescent buddies called him "retarded" is to likewise diagnose virtually every teenage male in America. Objections at 8. Williams was able to independently negotiate airports and air travel to a new city,[15] con Dwalon Youngblood into providing housing and employment recommendations, deal drugs, and mooch off the Youngbloods, until he developed a "didn't need anybody" attitude and decided to live in an apartment in a different neighborhood (against Dwalon's advice, again indicating rather less than a "follower" mindset). EH 052306 127-8; 2 EH pt. 1, 34-6, 66. After losing his job because his neglected automobile broke down (certainly not a crisis unique to mentally retarded people!) and being discovered in his lies, Williams returned to Texas. There, he mooched off Hazel Garcia and Reginald Tolbert, who, with

---

[15] And he took solo sightseeing trips in foreign countries without difficulty, for example. 2 EH pt. 1, 208-9. This is a far cry from requiring the aid of a travel company that caters to the needs of mentally retarded clients, as Garnett referenced. 4 EH 183.

Bobby Hood, although presumably not retarded themselves, were in turn mooching off Reginald's brother Oliver. Memorandum 47-55; 5 EH 44-5. Ron Johnson, the "roundtable," and Hazel Garcia were not Williams' caretakers, they were dope-smoking buddies who frequently benefitted from and were amused by Williams' behaviors. *Id.*; *e.g.* 1 EH 61, 63, 192; EH 052306 125. Williams' role as the "court jester" helped his friends cement relationships with young women. 1 EH 107. The boys found Williams' *sotto voce* comments in church hilarious, and justified leaving services early in the guise of "protecting" Williams from church leaders' reprimands. 1 EH 73-74, 136-7. However, Williams understood when such antics were inappropriate and could control himself *when the consequences mattered to him*. *Id.* at 88-89, 135-6. Typical of conduct-disordered people, Williams eventually reached the end of a variety of ropes by disregarding others' needs, whether of authority figures (his Navy and Trump Casino supervisors/coworkers) or of friends (for example, Dwalon Youngblood, 2 EH pt. 1, 66-7).

Williams makes much of a supposed motivation to succeed at a variety of activities, yet we cannot assume his motivations or definitions of success are ours. Objections at 9, 11, 12. While the attention Williams got would not always be considered positive by normal functioning members of society, nonetheless it was attention he desired. Ron Johnson made this mistake in assuming that Williams "just did not have the mental aptitude to be aware of what the social norms were," because it was totally foreign to Johnson that you could know "the rules" and still "deliberately flaunt them all the time." 1 EH 189. Numerous witnesses, civilian and military, agreed there is a distinction between *not* doing something and *not being able to* do something. Obviously, Williams' priorities were different from our own– ironing and keeping his shoes polished was not important to him, but having pot to smoke and a quarter-tank of gas in the car was. 1 EH 144; 4 EH 180. His conduct disorder affected the importance Williams placed on getting along with people and thus he was a regular focus of aggression and conflict. 2 EH pt. 1 212; EH 052306 123-4. For example, some of those dope-smoking buddies now claim that Williams would throw the ball away from the other kids on the playground. *Id.* at 123-4. It is unlikely, and rank speculation, that Williams made that choice

because he could not understand the basic idea of keeping the ball with the others. If that were true, the Special Olympics would have no team sports. A more parsimonious explanation is that he deliberately interrupted the play of children who picked on him. 1 EH 22-23; EH 052206 206-7.

The West Oaks Hospital psychiatrist diagnosed 16-year old Williams with ADHD, conduct disorder, and possible learning disorders.[16] RX2 61-63. This conduct disorder label accounts for many of Williams' problematic behaviors, not "deficits" consistent with MR. EH 052306 154. But, bottom line, Williams does not have to have a conduct disorder diagnosis, *per se*, to explain the data. Allen rhetorically queried, "Do I have to diagnose him [as conduct disordered] to account for any deficits in all these 11 areas, and the answer's no. A lot of those areas involving communication and social interaction-type behaviors are so consistent with problems in anti-social personality, that that's what accounts for the deficit, not MR. [A]nti-social personality disorders don't do well with long-term relationships. They burn people out. They betray people. They are often impulsive. They get involved with drugs. When you do drugs, you're going to do some strange things, especially in adolescence." EH 052306 154.

Additionally, some behaviors are a "normal variation of essentially normal behavior." EH 052306 125. Williams said he didn't care for basketball– he preferred boxing (and smoking pot and hanging out, the latter being understandable in Houston's heat and humidity.) *Id.* at 124. As a child he wore church shoes with play clothes, as many children rushing out of the house will. *Id.* at 126. He didn't bathe and change clothing like many normal boys who, given the opportunity, "act like . . . they were brought up in the woods by wolves." *Id.* at 143-5. (However, in his twenties, he cleaned his clothing in the washer and dryer and did not have body odor. 5 EH 47-48. Even now he cleans his cell and washes his body regularly. EH 052206 206.) He didn't cook or clean, another normal variation of his age and gender cohort. EH 052306 148. Equally common were his issues

---

[16] It is important to note that Williams does not object to the Magistrate's finding that he failed to show onset prior to age 18. Memorandum at 75. This alone is fatal to Williams' claim, and is supported by the psychiatrist's diagnosis at age 16.

with money management, especially considering his drug-oriented lifestyle. *Id.* at 148-9. As Allen noted,

> Incredibly common in adolescents. They don't know how to manage credit. They don't know how to manage money. It's an incredibly impulsive time of life anyway . . . And so it's not behavior by itself, and especially if you're in a drug culture, you're going to tend to live a cash lifestyle. You don't write checks for a pound of pot. You don't receive checks for a pound of pot. If you get a check for $500 for a pound of pot, you don't deposit that in your checking account. Does he have money concepts? [Yes], he does . . . [H]e knows some kind of money management skills. He can use an ATM machine, which I didn't learn how to use for two -- until two years ago.

*Id.* at 149-50. Williams himself told Kessner he preferred cash because he didn't like the risks of writing checks, hot or otherwise. 4 EH 5. As one obvious example of his money management skills, he saved money from his paychecks at Napa Auto Parts to buy a pound of marijuana for profitable resale in the clubs. RX 14B. He stole things to sell, because he wanted to save up to buy a truck. RX2 52. Illegal and anti-social, yes, yet clearly indicative of his capacity, understanding, priorities and definition of "success." His Navy mistakes and lack of military bearing were not unique to Williams, and many young sailors in the Navy shared the same attributes.[17] 2 EH pt. 1 241-244.

This normal tendency for young sailors was exacerbated in Williams' case because he had a lifelong problem with authority figures which blossomed during puberty. EH 052306 148. Williams' abilities to get along with his chosen group of friends and listen empathetically is in no way inconsistent with the doctor's diagnosis of a conduct disorder. EH 052306 127, 132.[18] He was

---

[17] "Q: And did Seaman Williams carry out the instructions that you gave him? A: At times. . . Not -- Q: Not consistently? A: No. Q: All right. What did that indicate to you about either his capability to follow your instructions and do the job or his attitude about your instructions and the job? A: The capability was there. It's just a matter of, "Maybe I don't feel like doing it like that," or "I don't want to do it today," or, "Maybe I'll just wait and maybe somebody else will do it." You know, kind of like that. Q: Was that a common occurrence among young sailors or was that unique to Mr. Williams? A: It was common among other people as well." Edward Moore, 5 EH 93-4.

[18] "You can have lots of friends, at least for a little while. You can get good conduct grades in school even. . . You know, there are a lot of people who liked Jeffrey Dahmer, nice guy. Q: And was Jeffrey Dahmer an Anti-Social Personality? A: Yes." Dr. Allen, EH 052306 132.

oppositional as a child, according to his mother. RX1 40. Williams rebelled against taking orders from people his own age. 4 EH 5. Williams often refused to follow corrections and suggestions. 2 EH pt.1 at 210, 212, 216. This really became a problem in the military.

> [T]here were performance problems, for example, in the Navy. There were performance problems after the Navy. The kinds of performance problems [Williams] was having were consistent with the kinds of performance problems he had in high school when the conduct disorder-type behaviors were apparent. There were conflicts with authority figures. He wouldn't do what he was supposed to do. He wouldn't do what he knew he was supposed to do. There was those kinds of performance issues. It didn't seem to be an incapacity to do things, rather than an unwillingness.

EH 052206 215 (Dr. Allen). Williams knew better and was capable of performing up to standard, but chose to take the easy way out. 2 EH pt. 1 225-6, 229; 5 EH 77, 99, 163, 168, *et. seq.*; EH 052206 216. Williams had special problems with the officers in his division. 5 EH 100. Williams did not enjoy life in his division and took courses to qualify for a different assignment. 5 EH 98-9. After being discharged from the Navy before he could strike for a different rate, Williams continued to demonstrate his attitude issues. For example, he abused the privilege of calling in sick and lost at least two jobs that way. 4 EH 6. Now on death row, he still refuses to obey orders. EH 052206 75-76; EH 052306 143-5. When it suits his needs, however, he can be quite clever and creative in attempting to buck the system, as seen by his failed attempt to send a fellow inmate the list of the Director's witnesses employed by TDCJ. Memorandum at 59-60. Even his nickname for the other inmate, "Selassie," fits in with previous historical interests of Williams' and denies his claims of subnormal intelligence. *Id.*

Again, the behaviors Williams has exhibited his entire life are not indicative of an inability to *comprehend*, but a lack of *effort*– a lack of the desire and discipline needed to endure the ordinary, boring *work* of being a productive citizen. Instead of working long hours (probably for a bare-living wage) as his cousin Dana McCann does (1 EH 20, 22), Williams didn't need to worry about rent, bills, clothing, food, or keeping a job– other people kept him supplied with pot, which in turn probably diminished any ambitions even further. If he couldn't manipulate people to get what he

wanted, he stole it at gunpoint (but then washed it, cleaned the tires, and bought CDs for the disc changer inside– to suit *his* priorities).  1 EH 235.

In summary, the AAMR cautions, "There has been a general tendency to attribute all changes to mood and behavior to the diagnosis of mental retardation.  This phenomenon has been named *diagnostic overshadowing*."  Red Book at 174 (italics in original, citation omitted).  This Court must avoid such overshadowing and be sure that the IQ scores and behaviors Williams enumerates are a result of significantly subaverage intelligence, not his plethora of other psychological issues, before it can grant the MR label.  Williams has failed to show this logical, scientific and legally-required causal link because he cannot.  His IQ has never been accurately measured because he has never exerted full effort except to get what he wants.  Williams is not MR;  he uses his low-normal intelligence to accomplish anti-social purposes. He is not protected by *Atkins*.  Memorandum at 76.

## CONCLUSION

Because Williams cannot establish that his federal constitutional rights prohibit his execution, this Court should deny relief.

Respectfully submitted,

GREG ABBOTT
Attorney General of Texas

KENT C. SULLIVAN
First Assistant Attorney General

ERIC NICHOLS
Deputy Attorney General for Criminal Justice

GENA BUNN
Assistant Attorney General
Chief, Postconviction Litigation Division

 /s/ Georgette P. Oden
GEORGETTE P. ODEN*
Assistant Attorney General
*Attorney-in-charge   State Bar No. 24029752

>Office of the Attorney General
>Postconviction Litigation Division
>P.O. Box 12548, Capitol Station
>Austin, Texas 78711-2548
>Telephone: (512) 936-1400
>Telecopier: (512) 320-8132
>Georgette.Oden@oag.state.tx.us
>
>ATTORNEYS FOR RESPONDENT

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing pleading has been served on Williams' counsel electronically through the court's computer docketing service today, February 12, 2007.

>/s/ Georgette P. Oden
>GEORGETTE P. ODEN
>Assistant Attorney General