# Ex. A

## (May 22 Transcript)



UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| JEFFREY DEMOND WILLIAMS, | . | CASE NO. CA-H-04-2945 |
| | . | |
| PLAINTIFF, | . | |
| | . | |
| V. | . | HOUSTON, TEXAS |
| | . | MONDAY, MAY 22, 2006 |
| DOUG DRETKE, ET AL., | . | 9:03 A.M. TO 4:34 P.M. |
| | . | |
| DEFENDANT. | . | |

. . . . . . . . . . . . . . .


EVIDENTIARY HEARING

BEFORE THE HONORABLE NANCY JOHNSON
UNITED STATES MAGISTRATE JUDGE


Trinity Transcription Services
122 Trinity Oaks Circle
The Woodlands, TX 77381
281-296-2290

RICHIE - REDIRECT                                    102

1          **THE COURT:** All right.  Well let's do her then.  And

2     then we'll go to lunch.

3          **MS. STEWART-KLEIN:** Okay.

4          **(Pause)**

5          **(Voices speaking off the record)**

6          **(Witness sworn)**

7                        **DIRECT EXAMINATION**

8     BY MS. STEWART-KLEIN:

9     Q    Can you please state and spell your name for the record?

10    A    Penny Richie, R-i-c-h-i-e.

11    Q    And before that were you --

12    A    Penny Long.

13    Q    -- known as Penny Long?

14    A    Yes.

15    Q    In fact, how recently did your name change?

16    A    About a month.  April 21st.

17    Q    And why did your name change?

18    A    'Cause I was married.

19    Q    Congratulations.

20    A    Thank you.

21    Q    Can you tell me what your occupation is?

22    A    At this present time --

23    Q    At this present time.

24    A    I'm an Administrative Assistant for -- I work for the Mail

25    Systems Coordinator Panel in Huntsville.

1   **Q**   And that's for TDCJ?

2   **A**   Yes.

3   **Q**   Okay.  And prior to this current position you have, what

4   position did you hold at TDCJ?

5   **A**   I was the Mail Room Supervisor at the Polonski Unit.

6   **Q**   Okay.  And how long did you hold that position?

7   **A**   For five years.

8   **Q**   And how long have you worked for TDCJ in total?

9   **A**   Nine and a half years.

10  **Q**   And as a mail room supervisor at the Polonski Unit, what

11  were your specific duties?

12  **A**   We I oversaw the mail procedures and the board policy and

13  made sure that the mail was distributed correctly, and

14  searched, and opened, and read, and given to the offenders.

15  **Q**   Okay.  And when you -- you say you searched and read, why

16  do you read the mail?

17  **A**   For the safety of the institution and the employees --

18  **Q**   Okay.

19  **A**   -- and the offenders.

20  **Q**   What are you looking for?

21  **A**   We look for any kind of criminal activity.  We look for

22  gang stuff.  We look for any kind of contraband, escape risk,

23  any kind of circumventing the rules, or anything like that.

24  **Q**   Were you served with a subpoena in relation to this case?

25  **A**   Yes, I was.

1   **Q**   And what did that subpoena ask you to do?

2   **A**   It asked me to copy all of the incoming and outgoing

3   correspondence for Offender Williams.

4   **Q**   And how can you be sure that the mail receive is from a

5   particular inmate?

6   **A**   When the mail is picked up in the mornings it is picked up

7   cell side, which means a clerk of ours or myself will go to

8   each cell in particular and pick up the mail that is hanging

9   out of that cell.  We recognize handwritings themselves, and

10  just that ways.

11  **Q**   Okay.

12          **MS. STEWART-KLEIN:**  May I approach the witness, your

13  Honor?

14          **THE COURT:**  You may.

15      **(Counsel approaches the witness)**

16  BY MS. STEWART-KLEIN:

17  **Q**   Showing you what's been marked as -- as State's Exhibit

18  10A.  Can you tell me what this is?

19  **A**   This is outgoing correspondence from Offender Williams.

20  **Q**   Now are you familiar with Jeffrey Williams' handwriting?

21  **A**   Yes.

22  **Q**   And how are you familiar with his handwriting?

23  **A**   Due to me seeing it daily, or often, or regularly, is the

24  word I should use, for the past five years.

25  **Q**   Okay.

1   **A**   For as long.

2   **Q**   And those documents are -- that I showed you that are 10A,

3   that's what you collected in response to the subpoena?

4   **A**   Yes, ma'am.

5   **Q**   So that is outgoing letters written by Jeffrey Williams?

6   **A**   Yes, ma'am.

7            **MS. STEWART-KLEIN:**  Just a second, your Honor.

8        **(Pause)**

9            **MS. STEWART-KLEIN:**  At this time, I'd move to admit

10   State's Exhibit 10a into evidence.

11           **THE COURT:**  Any objection?

12           **MR. CONNELL:**  Yes, your Honor.  Could we wait until

13   after cross examination to admit this?  I do have some

14   questions.

15           **THE COURT:**  All right.  That would be fine.

16   **BY MS. STEWART-KLEIN:**

17   **Q**   I'm going to show you another exhibit which is State's

18   Exhibit 16.  Can you tell me, do you recognize that

19   handwriting?

20   **A**   This appears -- this looks to be of Jeffrey Williams'

21   handwriting.

22   **Q**   Okay.  And again, you're familiar with Williams'

23   handwriting 'cause you've seen it on numerous occasions from

24   reading his mail?

25   **A**   Yes, ma'am.

1   **Q**    Now as part of your work in the mail room, have you

2   ever -- are you in charge of inmates' mail magazine

3   subscriptions?

4   **A**    Yes.

5   **Q**    Can you tell me how that works?

6   **A**    A family member or someone from the outside of TDC can

7   have a subscription and pay for a subscription and have it sent

8   in to the offender at the Unit.  And they come in on a regular

9   basis.  Newspapers, magazines, or, you know, any of that.

10  **Q**    Now can an inmate subscribe to a magazine on his own?

11  **A**    Yes.

12  **Q**    How does that work?

13  **A**    They do, what they call, an I25, which is an outside

14  purchase.  It has to be approved through the Warden, and the

15  money will come directly off of his TDC trust fund account and

16  pay to the subscription.

17  **Q**    Okay.  So as long as there's money in their inmate trust

18  account, there's nothing that prevents an inmate from

19  subscribing to a magazine other than the discretion of the

20  Warden?

21  **A**    No.

22  **Q**    And, in fact, if an inmate's family subscribe to an

23  objectionable magazine for an inmate, the Warden can stop that

24  as well?

25  **A**    The Warden doesn't.  If it comes in -- every magazine that

1    comes in through TDC through the mail system is reviewed on a

2    daily basis.  And they check it for questionable content.

3    Pornography, bestiality, sexual explicit images, anything like

4    that.  And if it's rejected, then a denial paper is served to

5    the offender, and he gets to make disposition of that magazine.

6    He can either have it destroyed.  He can appeal it through

7    Huntsville, through the mail system's coordinator panel, or he

8    can have it sent out to his family, or whoever he chooses.

9    **Q**    No further questions at this time, your Honor.

10           **THE COURT:**  Mr. Connell?

11                        **CROSS EXAMINATION**

12   **BY MR. CONNELL:**

13   **Q**    Hi Ms. Richie.  My name's James Connell.  How are you?

14   **A**    Good.

15   **Q**    You testified on cross -- excuse me, on direct examination

16   that you got a subpoena.  Could you tell us what that -- what

17   you got?

18   **A**    I got a subpoena from the Attorney General's Office

19   requesting the copies of the mail.

20   **Q**    And by a subpoena you mean a document which said Southern

21   District of Texas at the top of it?

22   **A**    I believe that's what it said.  Yes.  It's been a while

23   since I've had it.

24   **Q**    Okay.  So it wasn't just a letter of request from the

25   Attorney --

RICHIE - CROSS                                    108

1   **A**    Yeah.

2   **Q**    -- General --

3   **A**    It was, It was --

4   **Q**    -- it was an actual subpoena?

5   **A**    Yes, yes.  I got them -- I used to get them quite

6   regularly.

7   **Q**    And when did you get that document?

8   **A**    I cannot -- I don't know.

9   **Q**    Did you get it -- was it this year or last year?

10  **A**    It was either the beginning of this year, or if it was

11  last year, it was the latter -- last latter part.  I don't

12  know -- I can't -- I don't recall exactly what the date was on

13  it.

14  **Q**    Okay.  So it was either at the end of 2005 or beginning of

15  2006?

16  **A**    Yes, sir.

17  **Q**    And what did that subpoena ask you to do?

18  **A**    They needed all the copies of the incoming and outgoing

19  correspondence on this offender that was a non-privileged,

20  meaning no legal, special, or media mail.

21        And I don't recall if it had anything on the

22  publications or not.  Sometimes they request the publications,

23  and I don't recall if this one did or not.

24  **Q**    When you in the mail room are searching the mail for

25  contraband, pornography, et cetera, do you ordinarily keep

TRINITY TRANSCRIPTION SERVICES

RICHIE - CROSS                                    109

1   copies of all the incoming and outgoing mail?

2   **A**    Not the general correspondence, no.  We don't copy

3   anything unless it has a subpoena.  There's just too much of

4   it.

5   **Q**    Sure.  And so this subpoena did not ask you for copies of

6   existing documents.  This subpoena asked you to copy from any

7   incoming or outgoing mail from that period forward?

8   **A**    From that period, yes.

9   **Q**    Is pornography allowed in the -- TDCJ Polonski Unit?

10  **A**    No.

11  **Q**    And how do you all -- I know this is a classic, difficult

12  question, but how do you all define pornography?

13  **A**    They --

14  **Q**    Know it when you see it?

15  **A**    Well, they call it now -- they're now calling it sexually

16  explicit images.  It has defined that the genitals of the male

17  or the female -- the anus, the areolas of the breast, and there

18  cannot be any kind of oral genital contact of the same sex.

19  And I think that about covers it.

20  **Q**    Okay.  Let me show you -- and this is a copy of the

21  Respondent's Exhibit 20.  This is -- just so we can identify

22  it -- this is a copy of a magazine Murder Dog?

23  **A**    Yes.

24  **Q**    Just as something to identify, it has here written 12xe32?

25  **A**    Yes.

1  Q     So --

2  A     That would be his housing.

3  Q     Oh, okay.  So not withstanding the fact that this woman is

4  in somewhat of a state of undress, this would not count as

5  pornography?

6  A     That is not counted as pornography, no.

7  Q     So materials like this are allowed for Mr. Williams or any

8  other inmates --

9  A     As long as there's nothing in the content of written text

10  to show of any kind of gang or other criteria that we review

11  them on.  But as pornography in that picture, no it's not.

12  Q     Okay.

13          **MR. CONNELL:**  Your Honor, that's all the questions I

14  have.  I do have an argument about 10A when the Court is ready.

15          **THE COURT:**  All right.  Any redirect?

16          **MS. STEWART-KLEIN:**  No, your Honor.

17          **THE COURT:**  All right.  Thank you, ma'am.  You may

18  stand down.

19      **(Witness steps down)**

20          **THE COURT:**  What's your argument?

21          **MR. CONNELL:**  Your Honor, 10A is one of the items

22  which was not provided in discovery by the Respondent.  And

23  that itself is an issue.

24          But what we have learned today is that there's

25  another issue which was presented to this Court, and that is

1   that the Respondent apparently issued them Attorney-issued

2   subpoena without providing notice to the Petitioner under Rule

3   45, directing not the production of prior materials but

4   production of future materials.

5          The reason why that is a further issue is that this

6   issue came up in March when the -- I discovered that the

7   Attorney General had issued an -- a subpoena without giving us

8   notice.  I wrote to the -- I had correspondence with the

9   Assistant Attorney General who was involved, who withdrew the

10  subpoena, which is all a matter of record, and issued -- I

11  asked her the question, "well, were there any other subpoenas

12  that have been issued without notice that I didn't know about?"

13  'Cause at that time, the Attorney General represented to me

14  that she had not read the relevant rule and did not realize

15  that she had to provide a copy to opposing Counsel.

16         In a pleading stated to this Court, she represented

17  to the Court that there had been no other subpoena *duces tecem*,

18  which had been issued by the Attorney General.  And today we

19  learned that that representation is not true, and that this

20  witness was given a subpoena which may or may not be proper for

21  future action.

22         But I think that that severely aggravates the

23  discovery violation which they had originally committed with

24  respect to 10A.

25         **MS. ODEN:**  Your Honor, if I may be allowed to address

1 | this, since I'm the attorney to be that specific. I'm under

2 | the impression that Rule 45 does not require me to give notice

3 | to the Petitioner, it requires me to give notice of a subpoena

4 | to the attorney for the party being subpoenaed, which would be

5 | me.

6 | **(Pause)**

7 | **THE COURT:** What section requires the notice? I'm

8 | trying to find it quickly here.

9 | **MS. ODEN:** That's what I was trying to do, Judge.

10 | **MR. CONNELL:** If you all will give me just a moment,

11 | I'll pull it up.

12 | **THE COURT:** Oh, I see it. It's (b), (b)(1).

13 | **(Pause)**

14 | **MS. ODEN:** In addition, your Honor, I believe his

15 | objection was that these were not subject -- or these were not

16 | turned over during discovery. Some of the letters that are

17 | contained, I believe, were not even written at the time that

18 | the discovery requirements were required to be disclosed.

19 | **THE COURT:** Well if I read the Rule, it says prior

20 | notice of any commanded production of documents, and things, or

21 | inspection of premises before trial shall be served on each

22 | party is required by Rule 5(b). Obviously, Mr. Williams --

23 | **MS. ODEN:** And then I'm --

24 | **THE COURT:** -- is a party.

25 | **(Pause)**

113

1        **MS. ODEN:**  Your Honor, I believe that -- oh, I'm

2  sorry.

3        **THE COURT:**  Oh, go ahead.

4        **MS. ODEN:**  I believe that the requirements of notice

5  are not intended to circumvent the discipline and work product

6  as well.  So I would believe that communications within a

7  party, which would be between TDCJ and attorney for the TDCJ

8  would not -- you would not anticipate that discovery would

9  require you to disclose your own work product.

10       **THE COURT:**  That's right, but normally you don't have

11  to subpoena your own work product from your client.

12       **MS. ODEN:**  And these --

13       **THE COURT:**  So, you know.

14       **MS. ODEN:**  We've been working with TDCJ on why that

15  policy is the way it is, your Honor.  It's our understanding

16  that because they usually get requests from defense attorneys,

17  a lot of the line employees that are actually doing the

18  photocopying still insist on getting a subpoena even though

19  we've been trying to get the higher ups to communicate to the

20  lower downs that we are their attorney.

21       **THE COURT:**  That is not my problem.

22       **MS. ODEN:**  I understand that.

23       **THE COURT:**  And that is, I mean -- you and your

24  predecessor in this Court have acted like TDC is not your

25  client, when Mr. Dretke is the Respondent in this matter.  He

1    is absolutely your client --

2         **MS. ODEN:**  Yes, ma'am.

3         **THE COURT:**  And, you know, I'm shocked that your

4    client requires a subpoena.

5         **MS. ODEN:**  I'm definitely not trying to give the

6    impression that I don't believe that TDCJ is my client.

7         **THE COURT:**  Okay.  The question here, then, is you

8    did not give Mr. Connell notice of this subpoena, and you

9    didn't turn these documents over prior to, you know, just when

10   this hearing started originally?  Remind me.  It was just

11   several --

12        **MS. ODEN:**  No.  Those were turned over prior to the

13   beginning of this hearing.

14        **MR. CONNELL:**  That's correct, your Honor.

15        **MS. ODEN:**  And the documents weren't created on the

16   date of the discovery deadline.  They didn't exist yet.

17        **MR. CONNELL:**  If I could remind the Court what

18   happened is that there was an order that the Attorney General

19   turn over copies of their exhibits to us --

20        **THE COURT:**  Right.

21        **MR. CONNELL:**  -- back in November.  And then there

22   was one when the exhibit book.  And that was when the Attorney

23   General came before the Court, took the position that the prior

24   Judge's Lake's order had been vacated by whatever reason.

25        **THE COURT:**  Whatever.

1    **MR. CONNELL:**  And the Court -- we had a hearing on
2  it, and the Court ordered that immediately, that the Attorney
3  General turn over that material.  They did turn it over at that
4  point, and the Court said that it would take up the
5  admissibility and the effect of the discovery violation at an
6  appropriate time with respect to 10A.

7    **MS. ODEN:**  For example, your Honor.  One of the
8  letters was written December 2nd, 2005.  And the discovery
9  deadline, my understanding is, October 31st, 2005.

10    His letter was written on December 2nd.  I don't
11  exactly know what day he put it in the prison mail system.  You
12  have to allow a few days for it to be photocopied and sent to
13  us, and usually what TDCJ does is they'll photocopy several
14  days' worth, or weeks' worth, and then send it along to us.
15  The discovery deadline being Halloween, we can't turn over
16  something that the Defendant hasn't written yet, but we did
17  turn it over immediately -- and I will -- I will take the
18  blame -- I wasn't an attorney on the case at the time, but it
19  was turned over promptly.

20    It's not like it's a surprise to Mr. Williams.  He
21  wrote the letter.  He knows about the letter.  He knows about
22  all of these letters, they're his.

23    **THE COURT:**  Well, the problem is that the discovery
24  deadline kind of presumes to at least me, that discovery is
25  closed at that time.  And that parties are not seeking

 1   additional information after that time.  You've gotten several

 2   continuances on this matter for a number of different reasons,

 3   but, you know, a discovery -- you know, just because it's

 4   created after the discovery deadline isn't that compelling to

 5   me because it's -- I think it was anticipated that we weren't

 6   doing discovery after that time.  Apparently you still were,

 7   and I think that -- well, I think both sides were, weren't

 8   they?  I mean, we were still kind of eking this along on

 9   continuances.

10          **MR. CONNELL:**  No, your Honor.  We turned over all of

11   our documentation on October 31st.  We turned over our expert

12   reports at the same time.  There was a time when the Attorney

13   General asked for an extension of time to file Doctor Allen's

14   report, but there -- we have never asked for an extension of

15   time with respect to discovery.

16          The hearing was originally set for January.  We did

17   join the Attorney General's request for an extension of the

18   hearing date at that time, and we objected to the extension of

19   the -- we objected in writing, as a matter of fact, to the

20   extension of the discovery deadlines at that time.  To the

21   extent this written in November, October 31st deadline is --

22   forms any sort of excuse for the Director's office, Rule 26

23   clearly contemplates that discoveries on an ongoing material.

24   And so it is an ongoing obligation.

25          And if the Attorney General through, either through

1   having Mr. Williams cell tossed, or through this anticipatory

2   subpoena, or through whatever purpose can generate more

3   material in November, that does not relieve them of the

4   obligation to turn it over to us.  And the thing that I -- and

5   I apologize if I harp on this, 'cause I know it doesn't seem to

6   be the central focus, but the fact that there was a specific

7   discussion and pleading from the Attorney General representing

8   that there had been no other subpoenas issued, I think, is a

9   substantial issue.  And I think it substantially aggravates the

10  discovery violation which occurred here.

11          **THE COURT:**  Well, tell me where that representation

12  was made?

13          **MR. CONNELL:**  Your Honor, I don't have --

14          **THE COURT:**  'Cause I don't really recall.

15          **MR. CONNELL:**  -- the document numbered, but it is in

16  the withdrawal of the subpoena *duces tecem* to Emily Lundberg

17  (phonetic).  And -- which occurred in March.  If I can get to

18  an internet access, I can pull down the document off the

19  website.

20          **MS. ODEN:**  And I still stand behind that statement,

21  your Honor.  This subpoena for these documents was issued by

22  our office, my understanding is, before I came on the case.

23          Now I know what Mr. Connell is going to say, because

24  we had a phone conversation about this.  The subpoena only

25  takes -- only, I think, has affect for two months at a period

118

1    of time.  And I believe I joined the case a few days after the

2    subpoena had expired.  And I believe that Ms. Schmucker came

3    and said go ahead and sign off on these.  We've got to send

4    these out.  And so my signature does appear on the subpoena

5    that was, I believe, issued a few days after that document was

6    filed with this Court.  However, that -- I don't believe that

7    subpoena resulted in any of these letters because these letters

8    were written in 2005, which was long before I was ever on the

9    case.

10           Regardless, I mean, I think the bottom line is,

11   whether the letters come into evidence or not, they're still

12   before the Court.  They're still considered by their expert, by

13   our expert.  And I understand that the discovery deadlines are

14   meant to limit the amount of evidence so you can't keep

15   generating it, but in a case like this where you're trying to

16   determine if someone is mentally retarded, the fact that he's

17   writing letters that in no way sound mentally retarded a month

18   after the discovery deadline, should not insulate them from

19   being considered by the fact finder, which is looking for the

20   truth.

21           **THE COURT:**  Well, your expert relied on them.  Were

22   those in his report?

23           **MS. ODEN:**  I believe his report was written prior to

24   the date.  That's correct.

25           **THE COURT:**  So they weren't in your expert's report.

**TRINITY TRANSCRIPTION SERVICES**

1          **MS. ODEN:**  Is that -- when did you write your report

2   Doctor Allen, before I speak out of class.

3          **THE WITNESS::**  It's dated February 8th, 2006.

4          **MS. ODEN:**  It was considered, I mean.  Because this

5   report is dated February 8th, 2006.

6          **(Voices speaking off the record)**

7          **MS. ODEN:**  He did have some letters from the

8   defendant when he was writing his report.

9          **MR. CONNELL:**  Your Honor, I can tell the Court that

10  these letters are not listed on the statement.  My opinions are

11  based on interviewing related testimony we identified, as well

12  as a review of records provided by your officer.  There's a

13  listing of approximately 20 sets of records.  These records do

14  not appear in that list.

15         **THE COURT:**  Okay.  Well, I guess this is -- the

16  problem is that these were turned over late.

17         **MS. ODEN:**  Yes, ma'am.

18         **THE COURT:**  I've got some concerns about this.  I'm

19  going to consider it, Mr. Connell.  I don't know what these

20  letters are worth at this point.  You know, your client has

21  things going for him and other things not, but I'm going to

22  consider the letters.

23         I certainly don't condone the AG's conduct,

24  although -- and I don't understand the subpoena.  I mean,

25  that's amazing.

120

1          Anyway, let's go to lunch.  Let's be back at 1:20.

2          **UNITED STATES MARSHAL:**  All rise.

3     **(Recess taken from 12:06 to 1:23)**

4          **THE COURT:**  All right.  Good afternoon.  Please be

5     seated.  All right.  Who do we have?

6          **MS. ODEN:**  Judge, before we get started, I just

7     wanted to make sure I understood and made sure I had clear on

8     the record what exhibits have already been introduced.  Is that

9     okay?

10          **THE COURT:**  Go ahead.

11          **MS. ODEN:**  I believe we've already introduced

12    Respondent's Exhibits 1, 2, 3, and 4, which is the school

13    records, the West Coast Hospital records, Navy records, and the

14    employment records.  I don't know if --

15          **THE COURT:**  Hold on.  Do you agree with that

16    Mr. Connell?

17          **MR. CONNELL:**  I do, your Honor.

18          **THE COURT:**  All right.  Good.

19          **MS. ODEN:**  I don't know -- I don't believe we've

20    introduced Respondent's Exhibits 5 and 6, which is the TDCJ

21    records.

22          **MR. CONNELL:**  That's correct.

23          **MS. ODEN:**  Including the two cases that Mr. Williams

24    was accused of tearing out of a law book, and Exhibit 6, which

25    is the TDCJ medical and psychological history records pursuant

**TRINITY TRANSCRIPTION SERVICES**

1                              CERTIFICATION

2

3   I certify that the foregoing is a correct transcript from the

4   electronic sound recording of the proceedings in the above-

5   entitled matter.

6

7

8   _____          _____
                Transcriber                        Date

9

10  CA-H-04-2945

11  05/22/06 - 07/07/06

TRINITY TRANSCRIPTION SERVICES